CAPITAL TRANSPORT COMPANY, INC. *v.* SEGREST

No. 43665          December 17, 1965          181 So. 2d 111

*J. T. Drake, Jr.,* Port Gibson; *Daniel, Coker & Horton,* Jackson, for appellant and cross-appellee.

*Karl Weil,* Port Gibson; *Satterfield, Shell, Williams & Buford,* Jackson, for appellee and cross-appellant.

Inzer, J.

This is an appeal by Capital Transport Company, Inc. from a judgment of the Circuit Court of Claiborne County, wherein appellee, Oren R. Segrest, obtained judgment for personal injuries and property damages alleged to have resulted from an explosion and fire caused by the negligence of appellant. The cause was tried by a jury, which returned a verdict in favor of appellee in the amount of $90,000. Upon a motion for a new trial, the trial court upheld the finding of the jury as to liability, but ordered a new trial as to damages unless appellee would consent to a remittitur of $20,000. A judgment was entered to this effect, and from this judgment Capital Transport Company, Inc. has appealed. Appellee refused to enter the remittitur, and has cross appealed.

Appellant, Capital Transport Company, Inc., hereinafter referred to as Transport, in its assignment of errors assigns eighteen errors on the part of the trial court, but in its brief these are consolidated into five points. They are: (1) Appellant was entitled to a peremptory instruction; (2) The court erred in submitting the case to the jury under the doctrine of res ipsa loquitur; (3) The court erred in admitting the testimony of Dr. Eldred W. Hough as an expert witness; (4) The Court erred in admitting appellee's testimony with respect to loss of income attributable to his injuries; and (5) The verdict of the jury is so excessive as to evidence bias, prejudice and passion on the part of the jury.

Appellee and cross appellant, Oren R. Segrest, hereinafter referred to as Segrest, in his cross appeal contends the trial court was in error in entering an order that the verdict was excessive in the amount of $20,000

and in ordering a new trial for assessment of damages unless Segrest agreed to the remittitur.

The facts in this case show that Segrest was on June 18, 1963, and had been long prior thereto, the owner and operator of a business known as Segrest Oil Company. This business was located on the east side of Church Street in the town of Port Gibson. In his business Segrest operated a bulk storage plant where he sold gasoline, motor oil, grease, and other products of Gulf Oil Corporation. He also handled butane gas, tires, gas heaters, stoves, and other related items. Segrest owned all of the equipment located on his lot. There was an office building, also used as a display room, that faced Church Street. Immediately east of the office building were located three gasoline storage tanks. Each of these tanks had a capacity of 14,000 gallons. They were in a line directly east of the office building, and were placed on three concrete cradles, one cradle being at the front, one in the center, and one at the rear of the tanks. These tanks are referred to in the testimony as tanks No. 1, No. 2, and No. 3, Tank No. 1 being the tank immediately east of the office building, and the one used for storage of premium gasoline. Tank No. 2 was next in line, and it was used for storage of regular gasoline. The next, No. 3, was divided into two compartments, each with a 7,000 gallon capacity. The rear compartment was used for the economy brand gasoline known as Gulftane. The other compartment was used for storage of diesel fuel. To the north, or rear, of these tanks was a tank used for storage of kerosene. Immediately east of the tanks was a two-story warehouse used by Segrest for storage of appliances, tools, and other items used in his business. Immediately east of this building was a one-story warehouse which was used for storage of motor oil, grease and other petroleum products.

Capital Transport Company, Inc. was on June 18, 1962, and had been for many years prior thereto, en-

gaged as an intrastate and interstate motor carrier, transporting for hire gasoline, oil and other related products. Among its customers was Gulf Oil Corporation, and it had for many years delivered Gulf's products to Segrest.

On the morning of June 18, 1962, Transport sent one of its transport trucks to deliver a tank of gasoline to Segrest. The transport used to haul the gasoline was pulled by a 1958 International tractor, and the tank was on a 1961 Trailmobile. The tank was loaded with 7,200 gallons of gasoline, most of which was premium gasoline, and the balance of which was Gulftane gasoline. The transport truck was driven by Mr. Jeter, this being the second day he had driven this particular rig, although he had worked for Transport for several years. He arrived at the bulk plant of Segrest about 8:00 a.m. He drove into the plant from Church Street and parked at the unloading point, with the cab of his truck facing Church Street. After he arrived his load of gasoline was checked by Mr. Sumrall, an employee of Segrest, to ascertain that the tank on the transport contained the correct gallonage ordered by Segrest. After this was done, preparation was made to unload the gasoline.

Segrest had constructed his tanks in such a manner that they were filled by means of an underground pipe which extended from the unloading point, located forty-two feet south of tank No. 1. This was a two-inch pipeline which ran underground from the unloading point to the north and extended to the rear of tank No. 1. It then turned at a right angle and ran for a distance of about seventeen feet, at which point a standpipe extended from the pipeline above the ground. This standpipe was equipped with a quick coupling connection to which a flexible rubber hose could be attached and connected to any of the tanks to be filled with gasoline. Each of the tanks had an intake pipe located very near the bottom of the tank. On each intake pipe was a gate

valve which was manually operated. The intake pipes were not equipped with check valves to prohibit the contents of the tank from flowing back through the intake pipe when the main valve was open. This arrangement made it necessary that the gasoline delivered by Transport he pumped from the tank on the transport truck into the storage tank.

At the unloading point there was a stub coming up from the underground pipeline which did not extend above ground level. It was enclosed in a box-like arrangement similar to those used for water meters. To the stub was attached a quick coupling connection to which a hose could be attached that extended from the pump on the transport to the pipeline.

On the day in question, after Sumrall had checked the gallonage in the transport truck, he proceeded to the rear of the tanks. He connected the flexible hose to the valve on the stand pipe, and to the intake pipe on tank No. 1. While he was making these connections Jeter connected a rubber hose which he carried on his transport truck to the outlet pipe on the tank of the transport truck to the pump located to the rear of the cab of his tractor. He then connected another hose to the outlet from the pump to the stub on the underground pipeline. He then started the pump on his truck to operating, and Sumrall opened the valve on tank No. 1. After Sumrall ascertained that the connections were properly made and that the gasoline was flowing into tank No. 1, he went about his other duties. From this point on the unloading operation insofar as pumping the gasoline out of the tank on the truck into the underground pipeline was concerned, it was under the exclusive control of Jeter. On each of the storage tanks there was a pressure relief valve to allow air and fumes to escape from the tanks while they were being filled. The proof shows that these fumes and vapors were heavier than air and as they came out of the tank they settled to the

ground. The weather on this day was hot, humid and cloudy.

The pump on the truck was a shaft-driven pump which was operated by the power of the engine on the tractor. This operation made it necessary that the engine run during the entire unloading operation. The pump was located to the rear of the cab and over the muffler of the tractor.

To the front of the storage tanks Segrest had constructed a driveway which was used for placing his delivery trucks in order to load gasoline from the storage tanks into the tanks on his trucks. The storage tanks were high enough that the delivery trucks could be loaded by force of gravity. At the front of each of the tanks there was an outlet pipe upon which there was a gate valve. These outlet pipes connected into a pipe that connected to a standpipe arrangement. This arrangement was so constructed that there was an automatic valve which when the fill pipe was lowered, it opened, and when it was raised, it closed. On the day in question one of the Segrest delivery trucks was parked in front of the storage tanks when the operation began.

After Jeter had completed pumping out the premium gasoline he signaled to Dave Brown, a colored employee of Segrest, to that effect. Brown then closed the gate valve on tank No. 1 and Jeter disengaged the pump on his truck. Brown then disconnected the hose from tank No. 1 and connected it to the intake pipe on tank No. 3. While he was making this change Jeter, who had walked from his truck to the rear of the tanks, watched the change being made. Jeter then returned to his truck and opened the valve to the compartment containing Gulftane gasoline. He started the pump operating again and Brown then opened the gate valve on Tank No. 3 so gasoline could enter the tank. After this operation was started, Brown proceeded to load the tank on the delivery truck with regular gasoline from tank No. 2.

In order to do this it was necessary that he open the gate valve on tank No. 2, and open the dome hole on top of the tank on his truck and place into the hole the fill pipe that was used to carry the gasoline from the standpipe into the tank on the truck. The gasoline flowed into the truck by force of gravity, and this loading method is known as the ''splash'' method. As the gasoline flowed into the truck the contents were activated, and this caused fumes and vapors to escape from the tank through the opening on the top.

When all the gasoline had been pumped out of the transport except about fifteen gallons, an explosion occurred somewhere near the rear of tank No. 3. Following the explosion there was an intense fire. At the time of the explosion Jeter was in the cab of his truck. The engine on the truck was running and the pump operating. Brown was standing on the walkway of the delivery truck facing south, watching the gasoline run into his truck. Segrest was in the doorway of the two-story warehouse in a kneeling position facing south. Sumrall was standing just outside the doorway of the warehouse facing Segrest. They were packing an electric motor to be shipped for repairs. When the explosion occurred the blast was so terrific that it knocked Brown from the walkway of the delivery truck back onto the ramp. He was burned on his left side and face. The fire from the blast severely burned Segrest on his hands, face and legs, and right side. Sumrall was burned on his left side and face. The fire destroyed both warehouses with all their contents. Tanks Nos. 2 and 3 were also destroyed, along with the kerosene tank.

Just prior to the explosion, Lee Windham, an employee of Southern Bell Telephone Company, was driving north on Church Street at about 25 to 30 miles per hour. When he reached a point on the street just about in front of where the transport truck was parked, he observed out of the corner of his eye a flash. When

he turned his head to look, he saw a ball of flame at the back of the cab of the truck. He said this ball of flame was two or three feet above the ground and traveled in a northern direction, went under tank No. 1, and then an explosion occurred.

Segrest was immediately taken to the hospital, where he remained for forty-five days, and thereafter he was confined to his home for forty-five additional days. He suffered severe third and second degree burns of the face, head, neck, both arms, both hands, both knees, upper chest area, and right shoulder. During the time he was in the hospital he suffered severe physical pain through the medical procedure or treatment called "debridement," whereby his physician and nurses, using surgical knives, tweezers and scissors, cut away and removed decaying tissue from all the burned areas of his body. As a result of the formation of scar tissue, the flexor tendons in both of his hands were permanently injured, so that he has only fifty percent closure of the right hand and eighty percent closure of the left hand. Prior to his injury Segrest had devoted his entire time to the operation of his business, doing some of the physical labor necessary to operate the business.

In the course of the trial it was agreed and stipulated by the parties that Segrest's property losses amounted to $26,000, and that his hospital bills amounted to $1,049.

Transport in its motion for a new trial raised most of the questions that are argued on this appeal. The trial judge heard the motion and had counsel to submit briefs prior to passing on the motion for a new trial. He then rendered a written opinion which reflects that he gave much time and study to the questions involved in this law suit. We consider his opinion to be an excellent one, and we deem it appropriate that it be set out in full herein.

I have carefully examined and studied all of the briefs and authorities cited on both sides in connection

with the Motion for New Trial in the above styled cause. Permit me to thank all of you gentlemen for the very painstaking research you have done on the legal questions involved, as well as for your most able oral argument.

Much could be said and quoted by this Court in support of the conclusions it has reached, but I will content myself more or less with some basic determinations. It is the opinion of the Court that the case was fairly and properly tried, that the evidence adduced presented a case for determination by the jury, and that the jury was correctly instructed as to the applicable principles of law.

Obviously the central issue involves the question of the applicability of the doctrine of res ipsa loquitur, and the apparently conflicting results achieved in the many cases cited leave one aghast. It is my opinion that in a given case one cannot necessarily say at the outset whether this is a case for or against application of the doctrine, but that its propriety or not must await development of the facts. If inferences are to arise they must arise out of proven facts; and while the material circumstances from which an inference of negligence is to be drawn cannot rest in guess or conjecture, once such material circumstances are shown and proven the way is paved for a drawing of logical inferences from such proven circumstances. In the proper cases the plaintiff then is entitled to have the jury instructed as to its right to do so, where direct proof of the actual negligence is either impossible of establishment or lies solely within the power of the adversary to explain. (This is certainly no more unusual than the standard criminal instruction in larceny cases that "possession of property recently stolen is a circumstance which may be considered by the jury and from which, in the absence of a reasonable explanation, the jury may infer guilt of larceny." Per-

mitting a jury to infer guilt of theft from mere possession of a stolen article, where the degree of proof must extend beyond every reasonable doubt, is certainly more unusual than permitting an inference of negligence from proof that the fire originated at an instrumentality solely within the control of the defendant, and where such occurence (sic) could hardly happen in the absence of someone's negligence, and particularly where the degree of proof need only rise to a preponderance.)

The material circumstances developed by the plaintiff's proof show not only the occurence (sic) of a fire and explosion, but also that the fire originated in and about the defendant's transport truck. If this case involved mere proof of the occurrence of a fire and explosion of undetermined origin we would surely have a different question; for in such case there would be no more reason to infer negligence on the part of one than on the other. But the witness Windham testified with some positiveness that he observed the fire to originate at the rear of the cab of defendant's truck, and he proceeded to detail the course of the flame and ultimate explosion. There is additional testimony of physical facts to corroborate this version, including especially the testimony of the expert who undertook to explain from a technical and scientific standpoint the nature of what the witness Windham said he saw. It is true indeed that plaintiff's case hinges strongly on the testimony of this witness (according to the Court's thinking), and defendants' counsel urge caution against wholesale acceptance. In fact, defendant undertook with considerable skill to discredit the facts detailed by this witness, and to dispel the implications arising therefrom.

But it is often true that major decisions by juries, in criminal cases as well as civil, are grounded in a reliance on the testimony of a single eyewitness; but

the fact of such situation constitutes no barrier to acceptance or admissibility of the evidence. Suffice it to say, the jury was the sole judge of the credibility of all witnesses, and the worth of their testimony. It may be noted that there was no impeachment of credibility here; in fact, as stated, there was corroboration in several particulars. The District Judge in the Hygrade case was loath to accept the eyewitness' version as to where the fire started, and proceeded to call upon his own expert evaluation of the nature and rapidity of a gasoline vapor fire. Let us assume that this was his priviledge (sic) as a trier of fact, but let us remember also that his factual finding establishes no concept of law. What might be believed on this score in one case need not necessarily be believed in another. Moreover, there was some other testimony, and lack of testimony, in the Hygrade case as to actual origin of the fire, which might account in part for the Court's refutation of the particular evidence.

Faced then with this evidence as to the origin of the fire being in and around the transport truck, together with the expert's testimony in scientific support of the version, together also with testimony of the other witnesses negativing any idea of the fire having started on plaintiff's immediate premises. Defendant conceived it to be its duty, as does the Court, to explain that the fire and explosion did not happen through any negligence which might be inferred through proof that the fire originated at its truck. The evidence in explanation to prove defendant's exercise of due care and freedom from negligence was somewhat slight, and apparently was so evaluated by the jury, it consisting principally in a broad statement by the truck driver that his vehicle was in good mechanical order. Otherwise, the offer of explanation consisted in proof of several possibilities as to how this fire might possibly have started, these including

a spark from the compressor or the air conditioner, a lighted cigarette, and static electricity. These were possibilities, to be sure; but there is a failure of substantial proof of any material circumstances from which it might be inferred that any of these factors probably caused the fire and explosion. In fact, the testimony fairly well negatives the existence of any foundation facts which might give tone to a reasonable inference of negligence arising out of those factors, and more or less leaves them dangling in the midair of conjecture. I think the evidence was legally sufficient from the proven circumstances to justify a finding that it was ''more probable'' than not that defendants' negligence caused the casualty, and I cannot subscribe to an inapplicability of the res ipsa doctrine here on any basis that this accident might have been occasioned by one of several *equally probable* causes.

It is the opinion of the Court that the evidence adduced was sufficient to warrant submission of the case to the jury on the theory of res ipsa loquitur; and that under the proof the jury had a right to, and did, act upon a reasonable inference of negligence which arose through evidence that the fire and resulting explosion originated at the Defendant's truck.

It is the Court's further opinion that this case falls well within the general rule permitting applicability of the res ipsa loquitur doctrine, namely, that the accident was one which ordinarily would not occur in the absence of someone's negligence, that it was occasioned by an instrumentality within exclusive control of defendant, and that it was not due to any contribution on the part of plaintiff. The existence or non-existence of these factors is ultimately the province of the jury to decide, provided of course there is a sufficiency of evidence from the legal standpoint to justify such finding. The Court cannot say as a

matter of law here that the evidence was insufficient to support the finding as made by the jury.

Counsel for plaintiff cite in their brief in support of the verdict some very recent cases and text material reflecting a modern liberal evolutionary development in connection with applicability of the res ipsa doctrine, to the general effect that even though the proof of circumstances may reflect that two or more relatively separate agencies were involved in an occurrence, and that one or more, but not all, were under control of the person charged with negligence, the existence of this dual factor will not preclude application of the res ipsa loquitur doctrine so long as the evidence may be sufficient to justify the jury in concluding that the accident arose solely out of the agency under evclusive control of the person charged with negligence. Without necessarily predicating this opinion on the liberality of this so-called "Modern" doctrine, it may nonetheless be considered as fortifying the result reached here.

I conclude that the Motion for New Trial on the whole case should be overruled.

One of the grounds for Defendants' Motion for New Trial embodies the contention that the verdict is excessive, and I am of the firm opinion that it is. While it is true that the question of the amount of damages belongs peculiarly to the jury, and that the Court may not substitute its judgment for that of the jury, these basic principles are likewise counterbalanced by a recognized obligation of the trial Court to scrutinize all verdicts to the point of assuring that a given verdict is not the product of passion or prejudice on the part of the jury and that it is not legally excessive.

The plaintiff's injuries in this case are indeed severe, and he is unquestionably entitled to substantial damages. The Court is sure that this plaintiff or any person, would not elect to undergo the ordeal of pain

and suffering and injury encountered here for any sum of money, but yet the amount to be awarded must meet the test of such modern economic standards as have been accepted, approved, and developed in this jurisdiction. Some of the cases reflecting the standard for this type injury are cited in the brief of plaintiff's counsel, and there are others to which reference can be had. It is the opinion of the Court that the largeness of the verdict here was prompted by an overwhelming sympathy (perhaps understandably so) on the part of the jury, but that the elements of passion and prejudice permeate the verdict to the extent of making it legally excessive. The verdict is excessive to the extent of $20,000.00 and a new trial will be awarded for a proper assessment of damages unless within ten days the plaintiff should indicate a willingness to enter a remittitur in such amount, in which event judgment will be entered for the amount of the verdict, less such remitted amount, being the sum of $70,000.00. For precedent, see Case v. Y & M. V. RR. Co., 114 Miss. 21, 74 So. 773; Thomas v. Fleming, 241 Miss. 26, 128 So. 2d 854; Five-Two Taxi Service v. Simmons, 241 Miss. 182, 129 So. 2d 401.

Copy of Order enunciating such findings is herewith enclosed, the Original of which is being simultaneously sent to the clerk for entry on the minutes.

We will consider the first two assignments of error together in this opinion. We think that these two contentions have been clearly answered in the trial judge's opinion and that they really require no further comment from us. The testimony in the record amply justifies the conclusions that he reached as to the facts involved. He properly applied the law to these facts. Transport cites many cases from our jurisdiction and from other jurisdictions in support of its argument that there was insufficient evidence to submit this case to the jury. One of these cases is The Hygrade No. 18, 41 F. Supp. 304

(D. Mass. 1941), which is referred to by the trial judge in his opinion as Hygrade. This was a case in admiralty and involved a claim by owners of a steamship named Elwood against the owners of a steamship named Hygrade for damages as a result of a gasoline fire. The case was tried before a district judge without a jury, and he determined from the facts that although some witnesses testified that the fire originated at or near the cabin on Hygrade, such testimony was not sufficient to show that the fire originated on Hygrade. The facts further show that through the negligence of the crew of Elwood a large quantity of gasoline was spilled on the surface of waters adjacent to her, and the fumes therefrom filled the surrounding air. There were witnesses who said the fire originated on the Elwood. Others fixed the point of origin between the Elwood and Hygrade, while still others fixed the origin on Hygrade. In other words, the allegation that the fire originated on the Hygrade was contradicted by numerous witnesses. The trial judge held that the evidence concerning the origin or starting point of the fire left him in confusion as to the starting point. He held that under the facts of that case there were many places from which a spark might have come without negligence on the part of Hygrade, and that plaintiff failed to exclude those as the source of the fire. He held that it may not always be necessary to exclude every possibility that the fire originated from causes other than negligence of the person charged, but there must be enough evidence to remove the probable causes from which it might have started. His holding was to the effect that the doctrine of res ipsa loquitur did not apply under the facts of that case. As a trier of the facts, he refused to accept the testimony of the witnesses who testified that the fire originated on Hygrade. We have no such factual situation in the case before us. The jury in this case accepted the testimony of the witnesses that the fire originated at the

transport truck and traveled from that point to the point of explosion. The Hygrade case is not controlling under the facts of this case. There is no announcement of law in it that prevents the application of res ipsa loquitur in the case before us.

Appellant quotes from Matthews v. Carpenter, 231 Miss. 677, 97 So. 2d 522 (1957), as follows: ''Since the damage resulted from fire, of course the burden was on the plaintiff to show negligence.'' (231 Miss. at 682, 97 So. 2d at 524). This is a correct quote, and we cited in support of that statement the case of Yazoo & M.V.R. R. v. Hughes, 94 Miss. 242, 47 So. 622 (1908), and Black v. Stone County Lbr. Co., 216 Miss. 844, 63 So. 2d 405 (1953). However, in the following paragraph of *Matthews* we said:

Of course negligence may be proved by circumstantial evidence. See 38 Am. Jur., Negligence, Section 333, p. 1032, in part as follows: ''The law does not require every fact and circumstance which make up a case of negligence to be proved by direct and positive evidence or by the testimony of eyewitnesses. Proof of the fact of negligence may rest entirely in circumstances; in other words, circumstantial evidence alone may authorize a finding of negligence. Hence, negligence may be inferred from all the facts and attendant circumstances in the case, and where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inference from established facts, a prima facie case is made.'' This principle has been repeatedly approved by this Court. Palmer v. Clarksdale Hospital, 206 Miss. 680, 40 So. 2d 582; Johnston v. Canton Flying Services, 209 Miss. 226, 46 So. 2d 533; Farish v. Canton Flying Services, 214 Miss. 370, 58 So. 2d 915; Brown-Miller Company v. Howell, 224 Miss. 136, 79 So. 2d 818; Matthews v. Thompson, 231 Miss. 258, 95 So. 2d 438. Besides ''where a case turns upon circumstantial evidence it

should rarely be taken from the jury." Kurn v. Fondern, 189 Miss. 739, 198 So. 727. (231 Miss. at 682, 97 So. 2d at 524).

We think that this paragraph is particularly applicable to the facts in the present case and certainly supports the opinion of the trial judge that there was sufficient evidence to submit this case to the jury.

██ █ It really does not matter whether we apply the doctrine of res ipsa loquitur to the facts in this case, because we have held repeatedly that proof of negligence may rest entirely upon circumstantial evidence. We said in *Palmer, supra,* that:

It will be noted from the above authorities that the doctrine of res ipsa loquitur does not in any instance create a case of absolute liability, but simply raises a presumption or makes out a prima facie case of negligence to the extent that the defendant is called upon to meet it with an explanation. Aside from the stated doctrine, and without applying the familiar Latin phrase thereto, the same result is effected under the general rules applying to circumstantial evidence. In 38 Am. Jur. p. 1032, Negligence, Sec. 33, these rules are stated as follows:

"The law does not require every fact and circumstance which made up a case of negligence to be proved by direct and positive evidence or by the testimony of eyewitnesses. Proof of the fact of negligence may rest entirely in circumstances; in other words, circumstantial evidence alone may authorize a finding of negligence. Hence, negligence may be inferred from all the facts and attendant circumstances in the case, and where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inference from established facts, a prima facie case is made. The causal connection between an agency and the injury complained of need not be shown

by direct evidence.'' (206 Miss. at 698, 40 So. 2d at 586)

██ We are of the opinion that there was sufficient evidence in this case to submit the question of liability to the jury, and that there was sufficient evidence to support the verdict of the jury in this case.

██ The next point raised by Transport is that the trial court was in error in admitting testimony of Dr. Eldred W. Hough as an expert witness. It contends that Dr. Hough had no special knowledge of the subject matter in this case. Dr. Hough testified as an expert witness in the field of the sciences of physics and chemistry. His testimony was primarily to explain the scientific principles involved in the physical phenomena that the witness Windham testified he saw. Dr. Hough was at the time of the trial Professor of Petroleum Engineering and Chairman of that department at Mississippi State University. Dr. Hough testified that he holds the Bachelor of Science degree in Engineering Physics, the Master of Science degree in Physics, and the Degree of Doctor of Philosophy in Physics from the California Institute of Technology. His Ph.D. degree was Cum Laude. He is listed in ''Who's Who in Engineering'' and in ''American Men of Science.'' He served as Senior Research Engineer for Stanolind Oil & Gas Company and was a Research Fellow at California School of Technology. He has served as Lecturer at Tulsa University, Professor of Petroleum Engineering at the University of Texas, and as Consultant for Gulf Oil Corporation and for Humble Oil Company. He is the author of a great number of scientific publications, several of which deal with ignition of gasoline vapors in the vapor phase. It may readily be seen that Dr. Hough has an impressive background, and the trial judge determined that he was an expert in the field about which he testified. This ruling of the trial judge is supported by our decisions. In the case of Glens Falls Ins. Co. v. Linwood Elevator,

241 Miss. 400, 130 So. 2d 262 (1961), this Court, speaking through Justice Rodgers, discussed the question of the requirements of an expert witness in some detail. ██ We pointed out in that opinion that it is generally sufficient if a witness possesses knowledge peculiar to the matter involved not likely to be possessed by the ordinary layman. The trial judge certainly did not abuse his discretion in allowing Dr. Hough to testify as an expert witness.

██ We will consider the last two assignments of error together since they both relate to damages. We find from the record that Mr. Segrest was allowed to engage in some speculation in his testimony relative to his loss of income as a result of his injuries. Loss of income was a proper element of damage, but such loss, if any, was susceptible to definite proof by the records of his business operation. We realize that it was difficult for the trial judge to determine which part of the testimony related to loss of income and which part related to loss of earning capacity. This was due to the type of questions propounded by counsel for Segrest. The state of the proof on this issue could have influenced the jury to some extent in arriving at the amount of damages that the trial court found to be excessive.

██ We have carefully considered the evidence in this case relative to the injuries and other damages, in connection with the other facts and circumstances, and we are of the opinion that the amount of the verdict is so large that it evidences bias, passion and prejudice on the part of the jury. We are in agreement with the trial judge that it is excessive to the extent of $20,000.

██ We do not find any merit in the contention of Segrest on cross appeal that the trial court was in error in awarding a new trial on the question of damages unless a remittitur of $20,000 was entered. We affirm what we said Rayner v. Lindsey, Adm'r, 243 Miss. 824, 138 So. 2d 902 (1962), in regard to this question. We said:

The trial judge not only heard the testimony of the witnesses, including the medical evidence, but he saw the plaintiff in court, and in addition had an opportunity to hear the history of other similar cases read and discussed by eminent attorneys, to the end that when it became his duty to pass upon a motion for a new trial upon the question of excessiveness of the verdict, he could focus not only the facts but the law on the question of damages. It was his duty in the first instance to determine whether or not a new trial should be granted movant. Sec. 1536, Miss. Code 1942, Rec.

No appeal from an order granting a new trial was available to the parties in a damage suit on the question of excessiveness or inadequacy of damages until the above-mentioned Sec. 1536, supra, was amended by Chap. 230, Laws 1956. Since that time, this Court has followed the rule announced in Womble v. Miss. State Highway Commission, 239 Miss. 372, 123 So. 2d 235, 236 (1960), as follows: ''The rule as universally announced in our decisions is that the action of the trial court upon a motion for a new trial is to be favorably considered upon appeal and supported unless manifest error appears or unless the action of the trial court in sustaining the motion shows a manifest abuse of his discretion, and the rule is particularly applicable where the new trial has been granted, since in such cases the rights of the parties are not finally settled as they are where a new trial is refused. Smith v. Walsh, 63 Miss. 584; Harper, et al. v. Mississippi State Highway Commission, 216 Miss. 321, 62 So. 2d 375; Long v. Magnolia Hotel Company, 236 Miss. 655, 111 So. 2d 645, 114 So. 2d 667.'' To the same effect is Flurry v. Dees, 241 Miss. 296, 128 So. 2d 873. (1961). (243 Miss. at 832-33, 138 So. 2d at 905-06).

The trial judge did not abuse his discretion in awarding a new trial on the question of damages. For this reason this case should be affirmed on cross appeal.

This case is affirmed on direct appeal as to liability, but remanded for a new trial on the question of damages unless appellee and cross appellant shall agree to a remittitur of $20,000 within fifteen days. If the remittitur is entered, a judgment for $70,000 will be rendered here. The case is affirmed on cross appeal and remanded unless the remittitur is entered as herein provided.

Affirmed on direct appeal as to liability and remanded for a new trial on the question of damages unless remittitur provided for is entered. Affirmed on cross appeal.

*Lee, C. J., and Rodgers, Patterson and Smith, JJ.,* concur.