436 So.2d 1357 (1983)
Dr. Max PHARR
v.
Gerald ANDERSON & Patricia Anderson, Individually and on Behalf of all Others Similarly Situated.
No. 53666.
Supreme Court of Mississippi.
May 25, 1983.
Rehearing Denied September 14, 1983.
C.R. Montgomery, S.F. Stater, III, Canton, for appellant.
Johnson & Mills, Jerry L. Mills, Clinton, for appellees.
En Banc.

PART I
ROY NOBLE LEE, Justice, for the Court:
Gerald Anderson and Patricia Anderson filed suit against Dr. Max Pharr, Dr. Mary Wheatley, Nurse Patricia Nutter and St. Dominics Hospital in the Circuit Court of the Second Judicial District, Hinds County, Mississippi, seeking damages for malpractice which resulted in the death of their mother, Mrs. Joyce Anderson. The case was settled as to Dr. Mary Wheatley, Nurse Patricia Nutter and St. Dominics Hospital for the sum of $100,000, and it proceeded to *1358 trial against Dr. Max Pharr. The jury returned a verdict of $65,000 in favor of the appellees, judgment was entered in that amount, and Dr. Pharr has appealed here assigning six errors in the trial below.
Mrs. Joyce Anderson, age 41, had a long history of being a diabetic. Dr. Max Pharr had been treating her since 1976, and Dr. Mary Wheatley, a psychiatrist, had been treating her for approximately the same period. Mrs. Anderson had been admitted and discharged from hospitals by each doctor over a period of years. Both doctors were aware of the other's treatment of her.
On January 15, 1979, Mrs. Anderson was admitted to St. Dominics Hospital at approximately 11:50 p.m. complaining of vomiting, diarrhea, and inability to eat. Dr. Joe G. Stribling, who was assigned to the emergency room, ordered various tests, determined that her blood sugar level was 431 mg., and she was admitted to the Intensive Care Unit. The next morning Dr. Pharr's partner assumed the care of Mrs. Anderson, and after four days, she was released on January 20, 1979, with a final diagnosis of gastroenteritis.
Mrs. Anderson called Dr. Pharr on January 23, 1979, complaining about her condition, and he advised her to go to the emergency room at St. Dominics Hospital. He called there, made arrangements for her to be admitted to the emergency room, and ordered two series of drips, each one requiring six hours to complete, making a total of twelve hours. The time was around 2 p.m.
About 3:30 p.m., Mrs. Anderson became distressed. She was crying, screaming and uncontrollable, and Dr. Pharr, upon being called from the emergency room, advised the nurse to contact Dr. Mary Wheatley, the patient's psychiatrist, about her condition. Dr. Wheatley went to the emergency room, examined Mrs. Anderson, prescribed sedatives for her, and was successful in calming her. She was in the emergency room about 1 1/2 hours. Mrs. Anderson wanted to go home, and Dr. Wheatley stated that when she became quiet she could be discharged, and so told the nurse in charge, Patricia Nutter. Dr. Wheatley was listed on the hospital chart as the patient's physician, along with Dr. Pharr. There was testimony, including that of Emergency Room Nurse Patricia Nutter, that Dr. Wheatley discharged Mrs. Anderson, but Dr. Wheatley denied she had done so. She did testify that she told the nurse that insofar as she, Dr. Wheatley, was concerned, the patient could go home. She left the emergency room for home at approximately six o'clock.
About twenty to thirty minutes after the patient's discharge, Dr. Pharr went to the emergency room and hospital for the purpose of checking his patients. He inquired as to Mrs. Anderson's whereabouts, and the nurse on duty advised him that she had been discharged, which was fine with Dr. Pharr. He did not examine her records to determine what treatment had been administered and what her condition was, according to the chart.
Mrs. Anderson's condition grew worse at home, but no physician was called. About 2 a.m., January 24, her condition had worsened to the point that family members took her to the emergency room of St. Dominics Hospital, but, on the way, she stopped breathing and was pronounced dead on arrival at the hospital.
Except that he failed to review her chart of January 23 and failed to have her returned to the hospital for additional treatment, appellees do not contend that Dr. Pharr improperly treated Mrs. Anderson, or did anything wrong in his care or treatment of her. Further, that in so doing, or not doing, Dr. Pharr did not use or exercise the standard of care required in the Jackson area of a family physician.
Dr. Pharr contends that the standard of care does not require an attending physician, where another physician has entered the case and has discharged the patient, to do anything further insofar as reviewing records or attempting to return the patient to the hospital.

1.
Did the lower court err in holding that the appellees' witness, Dr. John Cockrell, is qualified as an expert in the field of family medicine?
*1359 Dr. John Cockrell was the only expert witness who testified for appellees on the standard of care required of a physician under the facts of this case and on causal connection between the discharge (treatment) of Mrs. Anderson and her cause of death. His educational and employment background follows:
M.D. Degree  1937 Columbia College of Physicians & Surgeons, New York
Internship & Residency  1941 Presbyterian Hospital, New York
Resident Surgeon  1940-42  Bassett Hospital, Cooperstown, New York
Lt. Commander, Public Health Service  1943-46  U.S. Marine Hospital, Buffalo, New York and Galveston, Texas
Chief of Surgery  1946-55  Veterans' Administration Hospital, Jackson, Mississippi
Chief of Staff  1955-68  Veterans' Administration Hospital, Jackson, Mississippi
Retired from Federal Service  1968
Resident and Chief Pathologist  1968-71  University Hospital, Jackson, Mississippi
Pathology Instructor  1971-77  University Hospital, Jackson, Mississippi
Retired  1977
Currently Assistant Clinical Professor of Surgery and Pathology, Jackson, Mississippi
Board Certified in Surgery and Anatomical Pathology Seventeen Publications Listed
In addition, Dr. Cockrell testified that he knew the standard of care as it applies to general practitioners because he had been associated with internists and general practitioners over the years, was Chief of Staff at Veterans' Administration Hospital for thirteen years and supervised the Admissions Office, where his duties consisted of trying to solve any problems which arose. He stated that he had not been involved in anything resembling or applicable to the practice of family medicine, but that family practice of medicine is not a great deal different than any other part of the medical practice and that anyone who knows the standard of care with reference to surgery or internal medicine would know the standard of care in general with reference to family practice.
In Early-Gary, Inc. v. Walters, 294 So.2d 181, 185 (Miss. 1974), the Court discussed the test to be applied in qualifying a witness as an expert:
In order for one to qualify as an expert in the field, one must be shown to have acquired a special knowledge of the subject matter about which he is called to testify. This knowledge may be obtained by a study of recognized authorities or through practical experience. The question of whether the proffered witness has obtained the required degree of specialized knowledge within a particular field is a matter within the sound discretion of the trial court, and unless there is an abuse of that discretion, his determination will not be disturbed on appeal. Illinois Central R.R. v. Benoit Gin Co., 248 So.2d 426 (Miss. 1971); Gulf, Mobile & Ohio R.R. v. Hollingshead, 236 So.2d 393 (Miss. 1970); and Capital Transport Co. v. Segrest, 254 Miss. 168, 181 So.2d 111 (1965).
In the recent case of King v. Murphy, 424 So.2d 547 (Miss. 1982), we held that an expert witness whose knowledge of, and familiarity with, the state-wide standard of care shall not have his testimony excluded. We are of the opinion that the lower court did not abuse its discretion in holding that Dr. John Cockrell was qualified as an expert witness in the field of medicine applicable to this case.

2.
Did the lower court err in allowing in evidence speculative testimony from appellees' witness Dr. Paul Oliver about the deceased's life work expectancy and earning capacity?
Dr. Paul Oliver is an Associate Professor of Economics at the University of Mississippi, which position he has occupied for the past fifteen years, teaching on both graduate and undergraduate levels. He holds the degree of Ph.D. in Economics *1360 from the University of Arkansas. Dr. Oliver testified as to the life expectancy of Mrs. Anderson, and indicated that, for the remainder of her work life expectancy, working at the rate of $3.50 per hour, she could be expected to earn a gross grand total of $175,448.00. Although the mortality tables refer to an average person in normal health, Mrs. Anderson was a diabetic and in ill health. However, the appellant had the right to show her physical condition and that she was not a healthy person, and the record so indicates. Mortality tables and such testimony are admitted only for the purpose of aiding and furnishing guidelines to the jury.
A more serious question arises with reference to testimony of Dr. Oliver referring to losses sustained by the daughter, Patricia Anderson, who was afflicted and needed constant care from other persons. Dr. Oliver gave testimony as to the loss of Mrs. Anderson as a caretaker for Patricia by computing $3.35 an hour for twelve hours per day, 365 days a year for forty years, which would amount to $560,000 as a gross amount over the life expectancy of Mrs. Anderson. However, Dr. Oliver did testify that he was not saying those figures would apply in this case but that he was simply giving a very broad guideline based on the hypothetical questions insofar as his reasoning and experience told him it would take to provide that type caretaker's services in Mississippi; and that there would be a wide variation in the figures.
In our opinion that testimony of Dr. Oliver was highly speculative and improper. However, the verdict of the jury was only $65,000, which indicates that the jury was not influenced by it and that such testimony was harmless.

3.
Did the lower court err in granting Jury Instruction No. 27?
Instruction No. 27 in its final form, after being amended, follows:
The Court instructs the Jury that if you believe from the evidence in this case that Dr. Max Pharr ordered two intravenous drips for Mrs. Joyce Anderson that were to have lasted for over six hours and that further, Dr. Max Pharr prescribed medications for the difficulties being suffered by Joyce Anderson, and further, that upon being advised of the emotional condition of Mrs. Joyce Anderson, Dr. Max Pharr called in her psychiatrist, Dr. Mary B. Wheatley as a psychiatric consultant, and that Dr. Wheatley did in fact, treat Joyce Anderson for her emotional condition, and that after her treatment the patient was discharged from the emergency room of St. Dominic Hospital prior to the arrival of Dr. Pharr and prior to the orders of Dr. Pharr being completed, and if you further find that Dr. Max Pharr learned that Joyce Anderson had been discharged from the emergency room when he arrived to treat her, and if you further find that Dr. Max Pharr did not review the hospital records, and if you further find that he made no follow up contact to Joyce Anderson, and if you further find that in so acting, Dr. Max Pharr failed to exercise the care, skill and diligence that physicians in good standing in Jackson, Mississippi in the general practice have exercised in like cases, and that Dr. Max Pharr's failure to exercise such care was the sole proximate cause or a proximate contributing cause of Joyce Anderson's death, then your verdict shall be for the plaintiffs.
The appellant objected to the instruction on the grounds that (1) it was against the preponderance of the evidence and confused and misstated what the standard of care would be with reference to the inaction of Dr. Pharr, (2) the instruction gives an undue emphasis to certain elements of evidence which had been offered, and (3) that the reference to the violation of the standard of care is a misstatement of law.
The instruction followed the uncontradicted evidence to the point where it states, "... if you further find that in so acting, Dr. Max Pharr failed to exercise the care, skill and diligence that physicians in good standing... ."
While some members of the Court think that the general negligence rule applies here instead of the standard of care, *1361 skill and diligence, under either theory the issue was properly submitted to the jury by the instruction and it does not constitute reversible error.

4.  5.
The appellant next contends (4) that the lower court erred in permitting the appellees to call Dr. Pharr as an adverse witness in order to establish the standard of care, and (5) the lower court erred in failing to sustain appellant's motion for a remittitur. We have carefully examined those assignments of error and find that there is no merit in them.
PATTERSON, C.J., BROOM, P.J., and BOWLING, HAWKINS, PRATHER and ROBERTSON, JJ., concur.
WALKER, P.J., dissents.

PART II
HAWKINS, Justice, for the Court:
Was a jury issue made on the question of negligence of Dr. Pharr?
It is the contention of counsel for Dr. Pharr that upon being informed Dr. Wheatley had authorized the discharge of his patient, he had no further duty or responsibility in reference to this hospital admission.
To answer this contention it is necessary to examine the relationship between Mrs. Anderson and Dr. Wheatley and Dr. Pharr, as well as the professional relationship between these two doctors.
Dr. Pharr's candor is certainly commendable. He was his own worst witness on this question.
Dr. Wheatley's medical practice was restricted to psychiatry, and Dr. Pharr knew this. He knew Dr. Wheatley had never undertaken the treatment of Mrs. Anderson's diabetes, and that Dr. Wheatley never practiced general medicine.
Dr. Pharr, of course, knew Mrs. Anderson was a chronically and seriously ill diabetic. When she was admitted at 2:00 p.m., he ordered intravenous drips to last two consecutive six-hour periods. When the emergency room telephoned him Mrs. Anderson was having emotional problems, he notified the attendant to call Dr. Wheatley. He knew, therefore, that Dr. Wheatley's treatment that afternoon would have been for her emotional problems.
When he arrived at the emergency room at 6:30 p.m., Dr. Pharr was informed Dr. Wheatley had discharged Mrs. Anderson. He, therefore, knew she had been discharged before the first drip had been completed. He did not look at her chart; he made no further inquiry. He admitted that had he looked at her chart, he would have confirmed what he then should have known: that this patient had gone home under the direction of the hospital before the medication which he had prescribed had been completed. Finally, he admitted that had he looked at Mrs. Anderson's medical chart, he would have telephoned her to return to the emergency room.
We are not presented here with a case of another treating doctor for diabetes discharging Mrs. Anderson. To the contrary, Dr. Wheatley had nothing whatever to do with the treatment of Mrs. Anderson's physical illness, and Dr. Pharr was aware of this.
We are compelled to agree with the circuit judge, therefore, that a jury issue was made on whether Dr. Pharr exercised a reasonable standard of care by omitting to take any further action upon being told Dr. Wheatley, a psychiatrist, had released his patient.
AFFIRMED.
PATTERSON, C.J., and BOWLING, PRATHER and ROBERTSON, JJ., concur.
BROOM and WALKER, P.JJ., and ROY NOBLE LEE, J., dissent.
DAN M. LEE, J., not participating.
ROY NOBLE LEE, Justice, dissenting to Part II:
Under the facts of this case, I do not think that Dr. Max Pharr was liable as a result of the death of Mrs. Joyce Anderson, and I dissent from Part II of the majority opinion.

*1362 1.
The liability of Dr. Pharr is based solely upon the testimony of Dr. John Cockrell. He examined the medical records and testified that:
I have an opinion as to the cause of death of Joyce Anderson which is that Joyce Anderson died of a heart attack, cardiac arrest. It was a combination of two things that caused her heart attack, one was dehydration that she suffered as a result of the nausea and the vomiting and being unable to drink anything and the second contributory factor was the uncontrolled diabetes. I think she probably had a recurrence of the gastroenteritis which caused the nausea and vomiting and that was interrelated with the untreated diabetes. Mrs. Anderson must have been tremendously dehydrated.
Dr. Joe G. Stribling was the emergency room physician at St. Dominics Hospital on the day when Mrs. Anderson was admitted and had worked in such capacity since January, 1978. He testified:
However, I do recall that Dr. Wheatley approached me after the 23rd of January and I already knew that Mrs. Anderson had passed away. To the best of my knowledge, Dr. Wheatley asked me to review the records to see if, based on the information on the chart, I felt that there was anything that could have been done differently that would have affected the outcome and I told Dr. Wheatley after I had reviewed the record that based on the laboratory evidence alone, without my having seen or evaluated the patient, I did not see a problem with the patient having been discharged... .
I do not feel that a blood sugar of 390 presents an acute situation which over a relatively short time span, say 24 to 48 hour period, a blood sugar of 390 would not be anticipated to cause any great difficulties to the patient... .
Dr. Max Pharr testified that he knew Dr. Stribling or some other equally-qualified emergency room doctor was on duty at the emergency room of St. Dominics Hospital on the afternoon of January 23, 1979, and that he would have expected Dr. Wheatley and the staff at the emergency room to discuss and solve the treatment of Mrs. Anderson prior to discharging her from the hospital; that he saw no reason to look at the record when he got to the hospital since the patient had already been discharged and since the patient had already been discharged without following his orders, and since the patient wasn't there to treat, even if he had the record; that it has not been a practice of his in twenty-five years to call patients back after they have been seen and discharged from the hospital; that when Mrs. Anderson was discharged he felt like they had adequately seen her and that's what he depended on; that he expected Mrs. Anderson had received whatever treatment was necessary that she have before she was discharged; that he has been practicing in the Jackson, Mississippi, area for twenty-five years, knows the standard of care with reference to follow-up treatment of a patient such as Mrs. Anderson, and that the standard of care used in the Jackson, Mississippi metropolitan area by physicians would not have required him to call Mrs. Anderson after he had found she had been released from the emergency room of St. Dominics Hospital that evening.
Dr. John Evans Mann testified on behalf of Dr. Max Pharr. Dr. Mann graduated from the University of Mississippi School of Medicine in 1966, currently is on the faculty of the University Medical Center as Assistant Professor of Family Medicine, teaching residence parttime, and he qualified as an expert in the practice of family medicine in the Jackson metropolitan area, and on the standard of care and skill exercised by family physicians in the area.
Dr. Mann reviewed the records pertaining to Mrs. Anderson on the afternoon of January 23, 1979, and it was his opinion, after a review of those records and upon facts of the case presented to him, that Dr. Pharr did not violate any usual standard of care in the community and that:
Under a similar situation I would not have reviewed the records or called Mrs. Anderson or a similar patient to Mrs. Anderson on that evening if she had been *1363 seen by another physician and discharged from the emergency room. I don't think Dr. Pharr violated any standard of care in the community of the Jackson, Mississippi, Metropolitan area by going to the emergency room and seeing that the patient was gone and had been discharged, seen, evaluated and discharged by another physician with a license to practice medicine in the State. There is no such thing among physicians in the Jackson, Mississippi, Metropolitan area as a partial discharge. Either you discharge a patient or you don't discharge a patient. By the standard of care and customs of practice in the Jackson, Mississippi, area, the physician who sees and evaluates and discharges a patient takes full responsibility for that patient. There is no difference when you discharge a patient between delineating between a mental problem and a physical problem. When you discharge a patient, you discharge them period. By the custom and practice and standard of care, a physician who discharges a patient accepts full responsibility for that discharge once the discharge is made.
Dr. Mann further testified it was his opinion that Mrs. Anderson, who had been a long-standing diabetic, had heart attacks and for a substantial period of time prior to death, had been under various forms of stress, had hypertension, was substantially obese, and had, since adolescence, been a diabetic; that Mrs. Anderson died of a cardiac arrest, probably a myocardial infarction or heart attack, with subsequent arhythemia, or irregularity in the heart beat, which is the most common form of death after heart attack; that diabetics are three times to four times more prone to have heart attacks than the general population, and that the most common cause of premature death in diabetics is heart attack or kidney failure, which Mrs. Anderson has no evidence of on her previous records; that she was obese; that the risk factors for heart disease are diabetes, obesity, high blood pressure, and a family history which is in the hospital records, which he read; that the basis of the laboratory reports were not compatible with dehydration; none of the reports indicate anything to him that Mrs. Anderson was suffering from dehydration; and that he would be in disagreement with anyone who expressed an unequivocal opinion that dehydration was a major contributing factor of the cause of death of Mrs. Anderson.
Dr. Thomas M. Davis, a resident of Jackson, Mississippi, since 1937, graduated from Tulane School of Medicine in 1951. He is on the staff of the Baptist Hospital, St. Dominics Hospital, Doctors Hospital, University Medical Center, and Hinds General Hospital, and is a diplomate of the American Board of Family Medicine  Family Practice, and has been recertified. He is a fellow member of the American Academy of Family Medicine and a member of the American Academy of Family Physicians. Dr. Davis testified further that his practice entails the treatment of diabetes in patients. He testified he had examined the records pertaining to Mrs. Anderson, and was acquainted with the facts surrounding her admission and discharge on January 23, 1979, from the emergency room; that Dr. Pharr did not deviate from the standard of care expected within the Jackson metropolitan area of physicians under similar circumstances when he did not, upon going to the emergency room and learning that the patient had been discharged, take any further action in seeking out the patient or following up treatment on the patient; that when a physician discharges a patient from a hospital in the Jackson area, he assumes the responsibility that the patient has gained maximum care; that, in his opinion, the blood sugar level of 390 on the afternoon of January 23, 1979, and Dr. Pharr's treatment or nontreatment of that blood sugar level did not have any effect or connection with the death of Mrs. Anderson; that, in his opinion, Mrs. Anderson died of a heart attack or a myocardial infarction.
Dr. William Clyde Nicholas, a witness for Dr. Pharr, is a member of the staff at the University Hospital, Jackson, Mississippi, and qualified as an expert in the field of family medicine and diabetes. From an examination of the medical records relating to Mrs. Anderson, it was his opinion that *1364 Dr. Pharr did not violate any standard of care as related to Mrs. Joyce Anderson on the afternoon of January 23, 1979, and that he would not suggest Dr. Pharr treat Mrs. Anderson any differently; that, in his opinion, Dr. Pharr acted appropriately within the standard of care in the Jackson, Mississippi, area in not reviewing the records of the patient or seeking further treatment for her on that evening; that he would have done nothing differently under the same circumstances, if he had been Dr. Pharr; that it was his opinion the cause of Mrs. Anderson's death was a heart attack with the irregular heart action; that he did not find anything on the afternoon of January 23, 1979, or on the morning of January 24, 1979, that would lead him to believe Mrs. Anderson was dehydrated.
The recent case of King v. Murphy, 424 So.2d 547 (Miss. 1982), stted the new standard of care in Mississippi which is required of a physician or surgeon in his field. That case, as do all other reported cases in this state, dealt with the actual treatment of a patient. No case has been cited to us involving malpractice under facts similar to the ones in the present case. It is uncontradicted that Dr. Pharr did not violate the standard of care required of a physician in the treatment or nontreatment of his patient.
In my view, the question here is not whether or not the standard of care required of a physician applies where Mrs. Anderson had been discharged by another physician, who had equal authority with Dr. Pharr and whose name appeared as treating physician on the patient's card as prominently as that of Dr. Pharr.[1] The question really is whether or not, when Dr. Pharr came to the emergency room and discovered that Mrs. Anderson had been discharged, he was under a legal duty to examine the chart and to obtain her return to the hospital. The question is different from that arising when a doctor's patient is in the hospital under his care and he fails to exercise proper care or diligence in the treatment of, or in seeing, that patient.
Under the facts of this case, I am of the opinion that there was no legal duty upon Dr. Pharr, when he discovered that Mrs. Anderson had been discharged from the hospital by another competent, qualified and attending physician, to examine her chart and attempt to return her to the hospital.[2] There being no legal duty upon the doctor, then there could be no negligence assessed against him. Therefore, he was entitled to a peremptory instruction against liability.

2.
The emergency room physician, who was in charge of the emergency room when Mrs. Anderson was admitted, and three other qualified family practitioners positively and unequivocally testified that Dr. Pharr acted according to the standard of care exercised by family practitioners, and other practitioners; that he violated no standard of care or policy of the profession; and that, had they been acting in his place, they would have done exactly as he did. The three doctors mentioned further testified that, in their opinions, Mrs. Anderson's death was due to a cardiac arrest and that her treatment or lack of treatment on that particular day did not cause or contribute to her death. On the record so made, and upon those facts, in my opinion, the verdict of the jury was contrary to the weight of the evidence, and the case should be reversed and remanded for a new trial.
Being of the opinion that the case should be reversed, I dissent from Part II of the majority opinion.
BROOM, P.J., joins this dissent.
WALKER, Presiding Justice, dissenting:
I am compelled to voice my dissent to the holding of the majority with reference to the liability of Dr. Max Pharr under the facts presented by the record in this case. *1365 The medical profession cannot live with this decision. We already have doctors leaving private practice because of the high costs of malpractice insurance. The very liberal interpretation of the majority as to negligence, and deviation from the usual standard of care of a physician, will have the effect of increasing the potential liability of every medical practitioner in this state, regardless of his specialty, and consequently will result in radically higher malpractice insurance premiums. The doctors will pass the cost of insurance onto their patients by increasing their fees and other charges. The medical insurance premium that the average family pays for protection against medical and hospital expenses are directly related to the costs of the services rendered by the medical profession and cases such as this increase and add to that burden dramatically. The majority opinion makes a medical practitioner a virtual insuror of his patient's life.
The deceased, Mrs. Joyce Anderson, was forty-one years of age, a brittle diabetic who had suffered from diabetes since childhood. Mrs. Anderson was a very sick lady and not only suffered from a diabetic condition but had suffered heart attacks, suffered from obesity and hypertension (high blood pressure) and for a substantial period of time prior to her death had been under various forms of stress, and suffered from serious emotional problems which required the services of a psychiatrist. Medical testimony established that the most common cause of premature death in diabetics is a heart attack or kidney failure, and that the high risk factors for heart disease are diabetes, obesity, and high blood pressure, and, in Mrs. Anderson's case her family medical history. Mrs. Anderson had all of these things.
For several years prior to her death on January 24, 1979, Mrs. Anderson had been under the care of Dr. Pharr for her physical condition and under the care of Dr. Mary Wheatley, a psychiatrist, for her emotional problems. On the day of her death, she had a combination of both. She first complained to Dr. Pharr from her home and related to him that she did not feel well. Dr. Pharr instructed her to go to the emergency room at St. Dominics Hospital, which she did. While in the emergency room, Mrs. Anderson became highly emotional and upset and virtually uncontrollable. Upon being notified, Dr. Pharr instructed the emergency room to call Dr. Wheatley who went immediately to the emergency room and after awhile got Mrs. Anderson quiet and in control of herself. Mrs. Anderson did not want to remain in the emergency room and expressed her desire not to be admitted to the hospital, whereupon Dr. Wheatley instructed the emergency room staff that she could be released to go home. The emergency room staff discharged her on instructions from Dr. Wheatley.
A short time later, Dr. Pharr arrived at the emergency room and upon inquiring about Mrs. Anderson was told that she had been seen by Dr. Wheatley and discharged. Under these circumstances, Dr. Pharr had a perfect right to assume that, upon seeing Mrs. Anderson Dr. Wheatley had diagnosed her condition as being primarily emotional as opposed to physical and that upon getting her quiet had properly discharged her to go home.
Under these circumstances, Dr. Pharr was under no obligation to review Mrs. Anderson's chart or record to determine whether the emergency room physician and nurses or Dr. Wheatley acted properly in discharging Mrs. Anderson. He had every right to assume that these people who were licensed in their profession had acted properly.
I am of the opinion that Dr. John Cockrell, who was the only expert witness who testified for Mrs. Anderson on the standard of care required of a family physician, was not qualified to give such testimony. He admitted that he had not been involved in anything resembling or applicable to the practice of family medicine, nor had he ever been an emergency room physician. He was with the public health service from 1943 to 1946 and with the Veteran's Administration from 1946 to 1968 when he retired from federal service. From 1968 to 1971 he was a pathologist with the University Hospital in Jackson, a pathology instructor *1366 from 1971 to 1977 at which time he retired for the second time. At the time of trial he was serving as an assistant clinical professor of surgery and pathology in Jackson. His board certification was in surgery and anatomical pathology. However, he made the broad, and, to me the unbelievable observation that he did not think the medical specialty called family practice of medicine "is a great deal different than any other part of the medical practice" and that anyone who knows the standard of care with reference to surgery or internal medicine would know the standard of care in general with reference to family practice. To me, such statements are nothing short of an absurdity. When anyone is being sued, as Dr. Pharr is in this case, and the verdict has the potential of being one that will destroy him financially and ruin his reputation in his profession and his liability rests upon the testimony of "an expert," then such testimony should come from a "real expert" and not someone just vaguely familiar with the standard of care through "association over the years with internists and general practitioners." Dr. Cockrell did not testify that he had ever discussed the standard of care with these doctors, so I assume that he had not. For these reasons, Dr. Cockrell should not have been allowed to testify as an expert on the standard of care in this case.
I am also of the opinion that neither the conduct of the emergency room physician nor nurses, Dr. Wheatley nor Dr. Pharr was a contributing cause of the death of Mrs. Anderson. After she returned home, she did not feel well and her condition worsened, yet she did not call Dr. Pharr or any other physician, nor did she return to the emergency room for treatment. After her condition became critical at home, Mrs. Anderson's family attempted to return her to the hospital emergency room where she was pronounced dead on arrival. In my opinion, her own failure to seek medical help, after having been given relief earlier in the day at the hospital, was the sole proximate cause of her death.
I am therefore of the opinion that the judgment against Dr. Pharr should be set aside and this case reversed and rendered on the merits discharging Dr. Pharr from liability.
NOTES
[1] Dr. Wheatley was a licensed medical doctor who specialized in psychiatry.
[2] I note that from 5:30 p.m. until almost 2 a.m. the following morning Mrs. Anderson's condition worsened. None of her family attempted to call Dr. Pharr or any other physician and return her to the hospital.