The matter of the quantum and quality of evidence necessary in a medical malpractice case to establish the failure to provide requisite emergency room care is presented to the Court. Plaintiffs/appellants, the heirs and next of kin of Mrs. Flora Hammond, deceased, invoking the provisions of Mississippi Wrongful Death Statute, Miss. Code Ann. § 11-7-13 (Supp. 1984), filed suit against defendants/appellees, Dr. C.E. Grissom, emergency room doctor, and Mississippi Baptist Hospital in the Circuit Court of Hinds County, alleging Flora Hammond's wrongful death from medical malpractice. The Circuit Court directed a verdict in favor of the defendants at the close of the plaintiffs' case in chief and entered final judgment thereon.
Appellants assign as error:
(1) The trial court erred in sustaining the defendants' objection to the qualifications of plaintiffs' expert witness.
(2) The trial court erred in directing a verdict in favor of the defendants.
 I.
Appellants are the heirs and next of kin of Flora B. Hammond, who died on February *Page 1051 
24, 1976. On February 23, 1976, after falling and injuring her head, Mrs. Hammond was admitted to the emergency room at the Mississippi Baptist Medical Center in Jackson, Mississippi at approximately 1:30 p.m. Appellee, Dr. C.E. Grissom, was the attending emergency room physician at the time of Mrs. Hammond's admission.
After x-rays were taken, Mrs. Hammond was placed in a treating room in the emergency room area of the hospital at 2:25 p.m. According to two of her daughters who were present, Mrs. Hammond was bleeding profusely from her right ear, nose and the back of her head. Mrs. Hammond's daughters, Cheryl Janotta and Rita Watkins, unassisted by hospital personnel, attempted to attend to their mother's needs. Cheryl Hammond Janotta testified that she used all available swabbing material that she could find to clean the blood from her mother's wounds. According to Janotta, no treatment or tests were administered by hospital personnel at this time.
It was Mrs. Hammond's daughters who attended their mother; they secured an orderly to remove Mrs. Hammond's dentures in order to prevent her from choking; they obtained additional swabbing material from another treatment room in order to clean up the continued bleeding; they obtained bed pans in order that Mrs. Hammond might use the bathroom.
At approximately 2:45 p.m., Dr. Grissom came into the treating room with Mrs. Hammond's x-rays and explained to the family that Mrs. Hammond had a skull fracture and needed the services of a neurosurgeon. When asked about the extensive bleeding, Dr. Grissom indicated that such bleeding was normal with this type of fracture. The family advised Dr. Grissom of their preference in selection of a neurosurgeon, and presumably Dr. Grissom left to contact the neurosurgeon.
Mrs. Hammond remained in the treating area from the time of Dr. Grissom's visit until approximately 4:10 when two nurses began an intravenous drip and left. At 4:30 p.m. two candy striper volunteers took Mrs. Hammond toward the intensive care unit, stopping to talk to a nurse on the way for from three to five minutes, arriving in the ICU at approximately 4:45 p.m. No medical care was administered during this two hour period, except the IV drip immediately before removal to ICU. The hospital records show that Dr. Glen Warren was called to the ICU at 4:45 p.m. and told "that Mrs. Hammond had arrived and she had experienced a respiratory arrest." Warren's physical examination report also stated that on his initial evaluation "she was in an irreversible neurological state clinically. The family was so informed."
According to a family member's testimony, Dr. Warren first talked to them at 5:15 p.m. Mrs. Hammond was pronounced dead at approximately 1:00 a.m. on the morning of February 24, 1976. Dr. Forrest G. Bratley, pathologist, testified that an autopsy revealed at least two ounces of liquid blood and blood clot on each side of Mrs. Hammond's brain. According to Bratley, the brain itself was swollen and compressed by the blood which had collected around it. As a result of this pressure, the vital respiratory and cardiac centers of the brain were compressed.
Dr. John V. Cockrell was offered as an expert witness on behalf of the plaintiff. Following the voir dire of Cockrell, the trial court sustained the defendant's objection to qualification of Cockrell as an emergency room expert. No proffer was made of Dr. Cockrell's testimony and, accordingly, the record does not contain the substance of what his testimony would have been.
 II. I. Did the trial court err in sustaining defendant's objection to the qualification of Dr. John V. Cockrell as an expert witness?
The professional qualifications and background of Dr. John V. Cockrell were fully developed during voir dire. Cockrell graduated from Columbia University Medical Center in 1937. His residency and surgical pathology was served at the Presbyterian Hospital in New York and his internship and assistant residency in surgery was taken *Page 1052 
at St. Marks Hospital in New York. Cockrell is licensed to practice medicine in Mississippi and came to Jackson in 1946 to serve as the chief of surgery at Veterans' Hospital. Upon retirement from that position in 1968, Cockrell was employed by the Department of Pathology at the University of Mississippi Medical School where he served as assistant professor of surgery and assistant professor of pathology until his retirement in 1977. Dr. Cockrell testified that he had knowledge of emergency room procedure at the Veterans' Hospital and that he was familiar with the standard of care and practice throughout the community. Dr. Cockrell testified that he had "walked through" the emergency room at the Mississippi Baptist Hospital, but that he had never studied the procedures and methods of handling patients employed by the Mississippi Baptist Hospital.[1]
In deciding whether the trial court correctly excluded the testimony of Dr. Cockrell, the initial inquiry is whether the offered expert testimony will be of assistance to the trier of fact. Hardy v. Brantley, 471 So.2d 358 (Miss. 1985); Dazet v.Bass, 254 So.2d 183 (Miss. 1971). In medical malpractice cases we may say with confidence that generally expert medical testimony will be of such assistance. Jeanes v. Milner,428 F.2d 598, (8th Cir. 1970) (expert evidence was not required since alleged negligence was within the comprehension of a jury of laymen); Duling v. Bluefield Sanitorium, Inc., 149 W. Va. 567,142 S.E.2d 754 (1965) (the general rule as to necessity of expert witnesses in medical malpractice cases is qualified so as to permit negligence to be established without expert testimony in cases where negligence or want of skill is so obvious as to dispense with need of expert testimony); Rural Educational Asso.v. Bush, 42 Tenn. App. 34, 298 S.W.2d 761 (1956) (expert testimony not necessary to establish negligence, for any layman would know that leaving sponge in plaintiff's body was negligent); c.f. Frazier v. Grace Hospital, 117 W. Va. 330, 185 S.E. 415 (1936) (plaintiff's extraordinary injuries and complications required expert testimony instead of conjecture of laymen), Annot., 40 A.L.R.3d 515, at 518 (1971). The problem with the case sub judice is that such a determination is not possible because no proffer of the testimony of Dr. Cockrell was made a part of the record. The posture of the case sub judice is therefore identical to that in Dazet v. Bass, supra. InDazet, one of the errors assigned on appeal was the refusal of the trial court to qualify plaintiff's expert witness. This Court stated:
 [T]hat question is not necessarily reached for the reason that Dr. Dugas was dismissed from the stand and no offer was made to take his testimony in the absence of the jury, nor was the substance of his testimony dictated into the record. When a party seeks reversal because of excluded testimony, he must either place the witness on the stand, ask the questions, and have the answers made of record, or else the witness must be presented and there must be a specific statement of what the answers or testimony of the witness would be.
254 So.2d at 187-188.
The recent refinements regarding qualification of medical experts announced by this Court in Hall v. Hilbun,466 So.2d 856 (Miss. 1985) apply retroactively to "any case in which an appeal is pending and in which the issue has been properly preserved. . . ." 466 So.2d at 876. Proper preservation of the issue of qualification of an expert medical witness includes satisfaction of the Dazet v. Bass requirement. See Hardy v.Brantley, 471 So.2d 358 (Miss. 1985).
Based upon Dazet v. Bass, supra, this Court concludes that reversal solely on *Page 1053 
the trial court's exclusion of Dr. Cockrell's testimony would be inappropriate due to the failure of appellants to make a record of what that testimony would have been.
However, this Court recognizes that the testimony of Dr. Cockrell's professional qualifications and experience, his expressed knowledge of the standard of care for emergency room doctors in Jackson, Mississippi, the city in which he practiced for nearly 40 years, and in other cities of the United States with which he was familiar, qualified him as an expert medical witness in the field of emergency room doctors.[2] He met the qualifications set forth in Hall v. Hilbun, supra and Hardy v.Brantley, supra, and should have been permitted to testify.
It is significant to note, however, that this Court does not require the appellant to establish with certainty that the excluded testimony would affect the outcome of the trial. Murrayv. Payne. 437 So.2d 47 (Miss. 1983). See Rule 103(a)(2) of the proposed Mississippi Rules of Evidence.
 III. Did the trial court err in directing a verdict in favor of defendant?
At the conclusion of the plaintiffs' case in chief, the trial court granted a directed verdict for defendants because of its view that the evidence regarding the standard of care as to emergency medical treatment and the absence of any competent medical evidence was insufficient as a matter of law.
The standards by which we review such a ruling are familiar. At the conclusion of plaintiff's proof in a medical malpractice case, upon motion by the defendant for a directed verdict, the trial court is required to consider the evidence in the light most favorable to the plaintiff, giving the plaintiff the benefit of all reasonable favorable inferences that may be drawn therefrom. Hardy v. Brantley, et al, supra; Hall v. Hilbun, 466 So.2d at 878-880; Pharr v. Anderson, 436 So.2d 1357, 1361 (Miss. 1983). Unless the plaintiff's evidence is so lacking that no reasonable juror could find for plaintiff, the motion must be denied. We take the same view of the evidence when on appeal there has been assigned as error the trial judge's granting of a directed verdict at the end of the plaintiff's case.
In the presentation of a case for medical malpractice, a plaintiff is generally required to present expert medical testimony, first, identifying and articulating the requisite standard of care under the circumstances, and thereafter, establishing that the defendant physician or hospital failed in some causally significant respect to conform to the required standard of care. Hardy v. Brantley, supra; Hall v. Hilbun,
466 So.2d at 874; Kilpatrick v. Mississippi Baptist MedicalCenter, 461 So.2d 765, (Miss. 1984) (medical malpractice cannot be established without expert medical testimony that the doctor failed to use ordinary skill and care).
On the other hand, matters which are within the common knowledge of laymen are exceptions to the rule that expert medical testimony is required. Radiology of Tupelo, P.A. and Dr.James T. Trapp v. Cayson, 471 So.2d 375 (Miss. 1985). It is necessary to examine the record and the precise charge of negligence made here to determine if this is one of those rare cases which forms an exception to the general rule, especially on a motion for directed verdict challenge.
As we understand it, the core of the negligence claim here is that the defendants became aware of the nature and extent of Mrs. Hammond's head injuries early on and that they simply administered no meaningful treatment. Dr. Warren's initial evaluation at 4:45 showed an irreversible condition. *Page 1054 
Apart from the exclusion of Dr. Cockrell's testimony as a medical expert, this record contains lay testimony of family members who had more than ordinary knowledge of medical care, and additionally the hospital record of Mrs. Hammond, and the testimony of Dr. Forest Brantley as to the cause of death.
Two of Mrs. Hammond's daughters were constantly with and assisted their mother after x-rays in the emergency room. One daughter, Mrs. Rita Watkins, had become a licensed vocational nurse. Both testified as to the absence of any medical attention from 2:20 p.m. until 4:45 p.m., except the insertion of an intravenous drip at 4:15. No one monitored their mother's condition, even though bleeding from the right ear, nose, mouth, and back of the skull was apparent. Another daughter, Mrs. Nancy Bowers, who had been in nurses training, asked Dr. Grissom three or four times to telephone the neurosurgeon for assistance. Dr. Grissom responded that her mother was drunk and that the best thing he could prescribe for her mother was to discharge her and let her sleep it off.[3] Mrs. Hammond was described by Dr. Grissom as uncooperative.
Dr. Grissom was observed by Mrs. Bowers drinking a soft drink, talking with another doctor about a fishing trip, with nurses, and on the telephone, and treating the only other observed emergency room patient with a bandaged hand. Mrs. Bowers asked nurses ten or twelve times for assistance and was informed that Dr. Grissom was in charge. One nurse going off duty assisted to provide a bed pan for Mrs. Hammond, and this nurse reported to the on-duty nurses of Mrs. Hammond's condition, also being informed that Dr. Grissom was in charge.
A witness overheard Dr. Grissom's telephone call at about 2:00 p.m., presumably to the neurosurgeon, stating that Mrs. Hammond's condition was not serious and to come after his office hours.
Mrs. Hammond's deteriorating condition resulted in her falling into a sleep and, upon arrival of the neurosurgeon, was pronounced neurologically irreversible at 4:45 p.m. She died at 1:00 a.m. on February 24, 1976.
Medical testimony in the form of hospital records support the failure to administer any care to Mrs. Hammond for the two hour period. The testimony of the pathologist was that a pressure cone of blood developed within the patient's head which caused respiratory and cardiac failure.
The plaintiffs' testimony, although largely non-expert, support an absence of medical care for a crucial two hour period. This negative non-care inaction period is also supported by the medical hospital records. Additionally, there was an improper denial by the court of the proffered expert to support the plaintiff's prima facie case.
We view all of these facts and circumstances in the light most favorable to the plaintiff. We give the plaintiff the benefit of all reasonable favorable inferences which may be drawn from the evidence. So viewed, the evidence establishes that at least by 2:45 p.m. Dr. Grissom and the employees of the hospital became aware, or in the exercise of ordinary care should have become aware, of the fact that Mrs. Hammond had a serious head injury. They did essentially nothing.
Ten or twelve times thereafter one of Mrs. Hammond's daughters asked the nurses to do something. They did nothing. The testimony of the pathologist suggests that the continuous intracranial bleeding unchecked for a number of hours was a major factor causing death.
These peculiar facts exhibit an absence of medical care, rather than the misfeasance of some complex medical diagnosis or treatment. Being so, this Court reasons that this case is one of those rare *Page 1055 
cases in which weight may be afforded the lay testimony of observers who had, not only common sense observations, but who also possessed training in the specialized medical profession. Mrs. Bowers, who had had nurses training, said that her mother was allowed to literally bleed to death in the emergency room.
Applying to the evidence the standards discussed above, this Court holds that the granting of a directed verdict in favor of each defendant was improper, requiring reversal and remand for a new trial. In so doing, we do not wish to be understood as adjudging that either Dr. Grissom or the Mississippi Baptist Hospital were guilty of negligence. We have not yet heard their side of the case. All we hold today is that as to each defendant the plaintiffs presented evidence of such quantity and quality that they were entitled to survive the defendants' motions for a directed verdict made at the conclusion of the plaintiffs' case.Hall v. Hilbun, 466 So.2d at 880; Hardy v. Brantley, et al.,supra.
REVERSED AND REMANDED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and HAWKINS, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
WALKER, P.J., concurs in result only.
DAN M. LEE, J., takes no part.
[1] In Pharr v. Anderson, 436 So.2d 1357 (Miss. 1983), the trial court's qualification of Dr. Cockrell as an expert in the field of family medicine was assigned as error on appeal. This Court held that the trial court did not abuse its discretion in qualifying Dr. Cockrell as an expert witness. 436 So.2d at 1359.
[2] Here we have no concern with the geographical component of the old locality rule because Dr. Cockrell practiced in Jackson, the same community in which Dr. Grissom practices and in which the Mississippi Baptist Hospital is located.
[3] Persons do not lose their right to the full protections afforded by the law because they are alcoholics or merely because they have been drinking. See Stong v. Freeman Truck Line, Inc.,456 So.2d 698, 707 (Miss. 1984) and particularly fn. 8;Dickerson v. State, 441 So.2d 536, 538 (Miss. 1983); and Cityof Jackson v. Locklar, 431 So.2d 475, 477 (Miss. 1983) fn. 1.