# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01055-SCT

*RUBY ANGELA HUBBARD AND PINKIE J.*
*HUBBARD, INDIVIDUALLY AND ON BEHALF*
*OF AND IN HER CAPACITY AS GUARDIAN OF*
*HER DAUGHTER RUBY ANGELA HUBBARD*

*v.*

*BILLY M. WANSLEY, M.D.*


| | |
|---|---|
| DATE OF JUDGMENT: | 01/25/2005 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | R. ALLEN SMITH, JR. |
| | LANCE PAUL BRADLEY |
| ATTORNEYS FOR APPELLEE: | MARY MARGARET KUHLMANN |
| | GEORGE F. BLOSS, III |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 04/26/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    This medical malpractice case against Dr. Billy M. Wansley is before the Court on appeal from the grant of summary judgment in his favor in the Harrison County Circuit Court, Second Judicial District. Hubbard[1] argues that: (1) her expert, Dr. Lynn Stringer, is

---

[1]When this case was initiated, the plaintiffs were Ruby Angela Hubbard and Pinkie J. Hubbard individually and in her capacity as guardian of her daughter, Ruby Angela Hubbard. While awaiting this appeal, Ruby passed away, and throughout this opinion, the

qualified to testify as to the breaches of the standard of care committed by Dr. Wansley; (2) Dr. Wansley should be held to the standard of a neurologist or neurosurgeon; (3) Dr. Wansley's conduct (that Hubbard alleges rises to the level of malpractice) falls under the "layman exception"; (4) the trial court erred when it entered final judgment of dismissal with prejudice in this case because Hubbard had timely designated an additional expert to testify in this matter pursuant to a prior court order; and (5) Hubbard's experts, Dr. Stringer and Dr. Alan Levinstone, created a genuine issue of material fact as to causation in this case. Finding no error, we affirm.

## FACTS

¶2.     On May 5, 1997, Ruby Angela Hubbard was admitted to Biloxi Regional Medical Center (BRMC), where she was treated for a light stroke and systemic lupus.  On May 11, she was discharged by Dr. Billy Wansley.  However, before leaving the hospital Hubbard complained of a severe headache and fell unconscious, striking her head during the fall.  Dr. Wansley, who was not present at the hospital when Hubbard fell, was telephoned by a nurse. He instructed the nurse to monitor Hubbard's blood pressure and level of consciousness for two hours, and if there was no change, to discharge Hubbard and send her home.  She was discharged and sent home at approximately 2:30 p.m. on May 11, 1997.

---

plaintiff/appellants will be designated collectively as "Hubbard."

2

¶3.     At 10:15 that same night, Hubbard's mother took her to the emergency room at BRMC where she was examined by an emergency room doctor, Dr. James Mitchell.[2]  After a CT scan of Hubbard's head was taken, Dr. Mitchell diagnosed her with a subarachnoid hemorrhage.[3]  Dr. Mitchell consulted with Dr. Wansley by telephone to inform him of the findings and discuss treatment options, and  Hubbard was admitted to the intensive care unit where her condition was monitored and she was treated.  For the first time since treating her lupus, Dr. Wansley saw Hubbard at approximately 2:30 p.m. on May 12, 1997.  He treated Hubbard in part by administering hydrochlorothiazide and a low volume salt water solution.

¶4.     On May 13, 1997, Dr. Richard Gorman, Hubbard's consulting neurologist, ordered that she be sent to the University of South Alabama Medical Center in Mobile, Alabama.[4]  On May 20, 1997, Hubbard underwent surgery to repair the ruptured aneurysm which had resulted in her hemorrhage.

---

[2]Hubbard's mother claims that before going to the emergency room, she contacted Dr. Wansley at home telling him that Hubbard was very nauseated.  She claims that Dr. Wansley ordered medication for Hubbard's nausea, and when it continued, Hubbard's mother again phoned Dr. Wansley at home, and Dr. Wansley told Hubbard's mother to allow the medicine time to work.  After Hubbard's nausea continued, Hubbard's mother took her to the emergency room.

[3] A subarachnoid hemorrhage is a somewhat diffuse bleed in the head that is normally not associated with a fall, which would create a bleed in a specific spot where there might be a fracture of the skull.

[4] One of the major points of contention in this case is the time at which Dr. Gorman was actually consulted.  Hubbard claims that part of Dr. Wansley's negligence was his failure to emergently contact Dr. Gorman after learning of Hubbard's condition.

**PROCEDURAL HISTORY**

¶5.     On April 27, 1999, Hubbard filed this action in the Harrison County Circuit Court.[5] Three years later, the case was removed to the United States District Court for the Southern District of Mississippi. After the dismissal of BRMC as a defendant, the case was remanded to the Harrison County Circuit Court on October 29, 2003.

¶6.     Prior to the remand, Dr. Wansley filed three motions for summary judgment. The first alleged that Dr. Lynn Stringer, Hubbard's expert, was not qualified to testify as to the standard of care in this case. The second alleged that Dr. Wansley's reliance on a medical chart regarding notification of a specialist was reasonable. The third alleged that Hubbard had failed to present evidence sufficient to establish a genuine issue of material fact as to causation in this case. These motions were carried forward from the federal district court to the circuit court on remand.

¶7.     On July 20, 2004, the trial court orally granted Dr. Wansley's first and third motions for summary judgment.[6] Subsequently, Hubbard successfully moved for extra time in which to designate an expert,[7] and on September 3, 2004, designated Dr. Alan Levinstone as her expert.

---

[5] The original defendants to this case were Biloxi H.M.A., Inc., d/b/a Biloxi Regional Medical Center, Coast Neurology Clinics, L.L.C., Dr. Billy M. Wansley, M.D., Dr. Richard J. Gorman, D.O., 15 unnamed parties, and 15 unnamed corporations or other businesses. At the time of this appeal, the only remaining defendant is Dr. Billy Wansley.

[6] This was not on the record, but the fact that this took place is not in dispute.

[7] The granting of this motion was an inadvertent mistake on the part of the trial court and is discussed in detail in part IV, infra.

4

¶8. The trial court issued a written Memorandum Opinion and Order on the summary judgment motions which it had granted orally in July, and entered final judgment with prejudice as to Dr. Wansley's first and third motions on January 27, 2005. After denial of Hubbard's motion to reconsider, she timely filed her notice of appeal.

## STANDARD OF REVIEW

¶9. It is well-settled that this Court applies a de novo standard of review to the grant or denial of summary judgment by a trial court. **Leffler v. Sharp**, 891 So. 2d 152, 156 (Miss. 2004). Summary judgment is appropriate when the evidence is considered in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Miss. R. Civ. P. 56(c); **Russell v. Orr**, 700 So. 2d 619, 622 (Miss. 1997).

## ANALYSIS

### I. WAS DR. LYNN STRINGER QUALIFIED TO TESTIFY AS TO THE APPROPRIATE STANDARD OF CARE OWED BY DR. WANSLEY?[8]

¶10. Dr. Wansley's motion for summary judgment challenged Hubbard's use of Dr. Lynn Stringer as an expert witness on the basis that Dr. Stringer, a board certified neurosurgeon, was not qualified to offer an opinion as to the standard of care of a physician practicing

---

[8]Because they were not specifically designated as part of the record for appeal as required by MRAP 10(b)(3)(ii), this Court is unable to consider the contents of depositions taken in this case which were not attached as exhibits to motions. Dr. Stringer's deposition was attached as an exhibit to a motion, and is therefore included through Dr. Wansley's designation of the record.

internal medicine. The trial court agreed with Dr. Wansley's contention and employed it as one of the grounds for granting summary judgment.

¶11. Absent an abuse of discretion, a judge's determination as to the qualifications of an expert witness will remain undisturbed on appeal. *Palmer v. Biloxi Reg'l Med. Ctr.*, 564 So. 2d 1346, 1357 (Miss. 1990) (citing *Ill. Cent. R.R. Co. v. Benoit Gin Co.*, 248 So. 2d 426 (Miss. 1971)). As in the present case, the disqualification of the expert in *Palmer* came at the summary judgment hearing. There, this Court determined this is inconsequential, stating:

> The law empowers a trial judge to determine whether a proffered expert is qualified to testify and does not restrict exercise of this power to the trial stage only. That is, a judge has as much power to resolve doubts on qualifications of proffered experts during the summary judgment stage as he has during the trial stage. And of course, the standard which this Court must apply when reviewing a trial judge's decision to disqualify remains unchanged–notwithstanding that the decision was made during the summary judgment stage. That is, this Court will determine whether the trial judge abused his discretion.

*Id.*

¶12. A prima facie case for medical malpractice must be made by proving the following elements: (1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant. *Drummond v. Buckley*, 627 So. 2d 264, 268 (Miss. 1993) (citing *Burnham v. Tabb*, 508 So. 2d 1072, 1074 (Miss. 1987)). "When proving these elements in a medical malpractice suit, expert testimony must be used. Not only must this expert identify and articulate the requisite standard that was not complied with, the expert

6

must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992) (citing *Latham v. Hayes*, 495 So. 2d 453 (Miss. 1986)).

¶13. Rule 702 of the Mississippi Rules of Evidence governs the admission of expert testimony. A witness may testify as an expert to "assist the trier of fact to understand the evidence or to determine a fact issue" if the witness is "qualified as an expert by knowledge, skill, experience, training, or education" and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." M.R.E. 702. It is generally not required that an expert testifying in a medical malpractice case be of the same specialty as the doctor about whom the expert is testifying. "'It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility.'" *West v. Sanders Clinic for Women, P.A.*, 661 So. 2d 714, 719 (Miss. 1995). Satisfactory familiarity with the specialty of the defendant doctor is, however, required in order for an expert to testify as to the standard of care owed to the plaintiff patient. *Id.* at 718-19.

¶14. Dr. Stringer stated in an affidavit that Dr. Wansley should have: (1) gone to the hospital to see Hubbard on the evening of May 11, 1997, when Hubbard went to the emergency room; (2) consulted with a neurologist about Hubbard's condition; (3) administered the medications Decadron and Nimodipine to Hubbard; and (4) not administered hydrochlorothiazide and a low fluid volume of saltwater. Dr. Stringer further

7

stated that Dr. Wansley violated the standard of care owed to Hubbard and the failure to adhere to that standard contributed to Hubbard's diminished neurological condition.

¶15. Hubbard counters that Dr. Stringer is well-qualified to testify as an expert in this case and it was error to grant summary judgment on the basis that Hubbard did not have an expert qualified to testify as to the standard of care. Specifically, Hubbard contends that Dr. Stringer's training and experience, combined with his familiarity with three treatises on the treatment of subarachnoid hemorrhages and with treatises in the field of internal medicine, give Dr. Stringer the knowledge necessary to form an opinion as to the standard of care that Dr. Wansley owed Hubbard.

¶16. In its Memorandum Opinion and Order, the trial court pointed out that Dr. Stringer did not consider himself to be an expert in the field of internal medicine and that he was not conversant in the medical literature relied upon by those in the field of internal medicine. The court's order also stated that Dr. Stringer testified that he had never practiced primary care medicine and that he had never held medical staff privileges that would entitle him to do so. Dr. Stringer himself testified that he had not recently read the internal medicine treatises with which Hubbard claimed he was familiar.

¶17. The dissent cites the same precedent we cite in making its argument that Dr. Stringer is qualified to testify in this case. Specifically, the dissent asks if it is not perfectly logical to allow "a person who is an expert in a *subject*" to "testify to the relatively mundane features of that same *specialty*, such as the standard of care?" (¶55) (Emphasis added). However, the dissent is either confusing or interchangeably using the terms "subject" and "specialty." We

8

do not dispute that Dr. Stringer has knowledge in treating the subject, subarachnoid hemorrhages, as a neurosurgeon. However, our precedent requires familiarity not with a particular subject, but with a specialty. In this case, that specialty would be internal medicine. It is illogical to allow a proposed expert to testify as to the standard of care of a specialty with which he has demonstrated no familiarity.

¶18. The dissent cites *West* as authority for this proposition. The dispute in *West* was whether an oncologist, Dr. Taylor, could testify to the standard of care that a gastroenterologist should apply in treating colon cancer. In affirming the trial court's exclusion of the testimony, this Court stated, "While Dr. Taylor testified in his deposition that he had treated patients with recognized clinical signs of colon carcinoma, he did not intimate that he knew how a gastroenterologist would treat such a patient." *West*, 661 So. 2d at 719. In the present case, although Dr. Stringer testified that he had treated patients with subarachnoid hemorrhages, he did not intimate that he knew how an internal medicine practitioner would treat such a patient. The specialty of internal medicine is an independent field of medicine. We are not saying that it was necessary for Hubbard to proffer an internal medicine practitioner as her expert, but our precedent requires a plaintiff in a medical malpractice action to procure an expert familiar with the specialty of the defendant doctor.

¶19. It is the position of Hubbard and the dissent that Dr. Stringer's knowledge, skill, training, education, and experience qualify him to testify as an expert in this case. However, Dr. Stringer's knowledge, skill, training, education, and experience are in the area of neurosurgery. While it is obvious that Dr. Stringer is an experienced and knowledgeable

9

neurosurgeon and that he has experience in treating subarachnoid hemorrhages as a neurosurgeon, Hubbard has offered no evidence that Dr. Stringer has any familiarity with the standard of care that would be required of an internal medicine specialist in treating a subarachnoid hemorrhage. Therefore, it cannot be said that the trial court abused its discretion in holding that Dr. Stringer was not qualified to testify as to the standard of an internal medicine practitioner. Summary judgment was appropriate unless it could be found that Dr. Wansley should have been held to the standard of a neurosurgeon or neurologist as argued by Hubbard.

## II. SHOULD THE TRIAL COURT HAVE HELD DR. WANSLEY TO THE STANDARD OF A NEUROSURGEON OR NEUROLOGIST?

¶20. Hubbard argues that Dr. Wansley should have been held to the standard of a neurosurgeon or neurologist because he assumed the duties of a neurosurgeon or neurologist when he treated Hubbard's subarachnoid hemorrhage and failed to notify the consulting neurologist, Dr. Richard Gorman, of Hubbard's medical condition.

¶21. In *West*, we "reiterate[d] that a physician may be held to the standard of care of another specialty other than his own, if the physician assumes the duties of the specialty." 661 So. 2d at 720 (citing *Lewis v. Soriano*, 374 So. 2d 829, 831 (Miss. 1979)). In *Lewis*, this Court found that the defendant doctor, a specialist in family practice, should have been held to the standard of an orthopedic surgeon. Lewis was involved in a motorcycle accident and was examined by Dr. Soriano. The examination revealed that Lewis had "sustained multiple bruises, lacerations and abrasions, a fractured talus, complicated by posterior dislocation of

10

the talus, and was bordering on shock." *Id.* at 830. This Court held that because Dr. Soriano,

a family practitioner, assured Lewis that he could treat the fracture and undertook the

responsibility of treating the fracture, he should be held to the standard of an orthopedic

surgeon.[9] *Id.* at 831.

¶22.    The "heightened standard of care" principle from *Lewis* was further explained in

*Adkins v. Sanders*, 871 So. 2d 732 (Miss. 2004). In *Adkins*, this Court held that it was proper

for the trial court to find that the defendant, an obstetrician/gynecologist, should not be held

to the standard of a rheumatologist:

> Unlike the physician in *Lewis*, Dr. Sanders did not admit that he assumed
> responsibility as a specialist in another medical discipline, i.e., as [the
> plaintiff's] rheumatologist. He did not admit that the care that was given was
> inferior to the treatment she could have gotten from a specialist. Dr. Sanders
> did not assure that he could achieve a good result nor did he claim to possess
> the skills necessary to treat her condition which resulted from lupus. In fact,
> Dr. Sanders made significant efforts by referrals to other physicians in an effort
> to determine the nature of [the plaintiffs] complications and the appropriate
> treatments.

---

[9]In *Lewis*, Dr. Soriano argued that he should not be held to the standard of an
orthopedic surgeon, in part, because he had referred Lewis to an orthopedic surgeon.
However, because Dr. Soriano told Lewis that he could treat the injuries, he was "claiming
he possessed the skill necessary to perform the procedure involved," and therefore the
referral to an orthopedic surgeon was "qualified rather than unequivocal." *Lewis*, 374 So.
2d at 831. There is no referral issue in the present case.

*Adkins*, 871 So. 2d at 737.[10] The Court found that Dr. Sanders's knowledge of the plaintiff's lupus when he began treating her as an obstetrician during her pregnancy did not cause him to assume the duties of a rheumatologist. *Id.* at 740.

¶23.    Although our precedents do not provide a specific test for determining whether a defendant doctor of one specialty should be held to the standard of another specialty, at least two common factors should be considered in determining whether a doctor has "assumed the duties" of another specialty: whether assurances were given by the doctor to the patient; and whether consultations or referrals to a doctor of another specialty were, or should have been, made.

¶24.    In this case, there is no claim and no evidence that Dr. Wansley gave any specific assurances to Hubbard about the treatment of her subarachnoid hemorrhage. The dispute in this case is whether Dr. Wansley consulted Dr. Gorman, Hubbard's consulting neurologist, when she was admitted to the intensive care unit.

¶25.    According to Hubbard, Dr. Gorman was not consulted until "6:00 p.m. on May 12, 1997, some thirty-two (32) hours after [her] fall at Biloxi Regional Medical Center and some twenty (20) hours after Dr. Wansley received confirmation from the emergency room physician, Dr. James Mitchell, that [she] was diagnosed with subarachnoid hemorrhage." Dr.

_____

[10]  *Adkins* dealt specifically with the denial of a proposed jury instruction as to the standard of care issue. The proposed instruction was the same one that was given to the jury in *Lewis*. *Adkins*, 871 So. 2d at 737.

12

Gorman's affidavit specifically states that he had no knowledge of Hubbard's readmission to the hospital "until late in the afternoon on 5/12/97."[11]

¶26.    Dr. Wansley claims that Dr. Gorman was notified in the early morning hours on May 12, 1997. On the physician order sheet, the orders given by Dr. Wansley to the physician in the emergency room, Dr. James Mitchell, included this order: "Notify Dr. Gorman--please page." The words "please page" had been stricken through, and the words "notified in the E.R." had been written to the side.[12]  Dr. Wansley claims that it was not his responsibility to personally inform Dr. Gorman of the situation, and that it was not unreasonable for him to rely on the note written on the chart, which led him to believe that Dr. Gorman had been consulted. Dr. Wansley maintains that by ordering the consult with Dr. Gorman, he acted as a proper internal medicine doctor should have and that he should be held to that standard.

¶27.    The crux of Hubbard's argument is that Dr. Gorman was not contacted soon enough. However, Dr. Wansley fulfilled his duty to contact Dr. Gorman emergently by ordering the consultation through the emergency room, where Hubbard was located at the time. Dr. Wansley gave the order for Dr. Gorman to be consulted immediately after hearing about Hubbard's condition. It is unclear as to whether any follow-up was done by Dr. Wansley to

---

[11] Dr. Wansley did move to strike Dr. Gorman's affidavit. Pointing out that Dr. Gorman himself was once a defendant in this matter, Dr. Wansley questions the veracity of Dr. Gorman's statement.  The trial court never ruled on this motion.

[12]The quality of the copy of the physician order sheet in the record is not perfect. However, it is clear that the order was written on May 12, 1997.  The time under the date appears to be 0115, military time for 1:15 a.m.  There was deposition testimony to this effect as well.  There is no indication of when the "notified in the E.R." notation was made.

13

determine whether Dr. Gorman had been consulted, and if so, when.[13]   What is clear is that he did not undertake to treat Hubbard's condition on his own to the exclusion of a neurologist.   Dr. Wansley should not have been held to the standard of a neurologist or neurosurgeon.

### III.   DOES DR. WANSLEY'S ALLEGED MALPRACTICE FALL UNDER THE "LAYMAN EXCEPTION," MAKING IT UNNECESSARY TO PRESENT EXPERT TESTIMONY?

¶28.   According to Hubbard, even if Dr. Stringer was found to be unqualified to testify in this case and Dr. Wansley should not be held to the standard of a neurosurgeon or neurologist, summary judgment was still inappropriate.   She argues that she is not required to present expert testimony because Dr. Wansley's conduct falls within the "layman exception."

¶29.   Generally, a physician's negligence may be established only through the testimony of an expert witness, but in an instance "where a layman can observe and understand the negligence as a matter of common sense and practical experience," expert testimony is not necessary. *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 795 (Miss. 1995) (citing *Walker v. Skiwski*, 529 So. 2d 184, 187 (Miss. 1988)).   "Lay testimony is sufficient to establish only those things that are purely factual in nature or thought to be in the common knowledge of laymen." *Drummond v. Buckley*, 627 So. 2d 264, 268 (Miss. 1993)

---

[13]The deposition of Dr. Mitchell cannot be considered by this Court in making its decision in this case, and the content of that deposition has not been considered in evaluating this case. *See* n.8, *supra*.

(citing *Kelley v. Frederic*, 573 So. 2d 1385, 1388 (Miss. 1990); *Palmer*, 564 So. 2d at 1355; and *Walker*, 529 So. 2d at 187).

¶30.   The layman's exception applies to situations of obvious negligence. "For instance, a layman can understand without expert testimony that 'the unauthorized and unexplained leaving of an object inside a patient during surgery is negligence.'" *Sheffield v. Goodwin*, 740 So. 2d 854, 857 (Miss. 1999) (quoting *Coleman v. Rice*, 706 So. 2d 696, 698 (Miss. 1997)).

¶31.   Hubbard points to *Hammond v. Grissom*, 470 So. 2d 1049 (Miss. 1985), as a specific example of how her situation falls under the layman's exception. In that case the Court found that an issue regarding an absence of medical care for two hours did not require expert testimony as it was within the layman's exception. Hubbard claims that this is similar to Dr. Wansley's absence from the hospital until 2:00 p.m. on May 12, 1997.

The patient in *Hammond* had fallen and injured her head. *Id.* at 1050-51. She was taken to the emergency room, and after x-rays were taken, was placed in a treating room at 2:25 p.m. At this time, Hammond's two daughters were with her and she was bleeding profusely from her right ear, her nose, and the back of her head. The daughters testified that they themselves began to clean their mother's wounds with any swabbing material they could find as no medical treatment was being given by hospital personnel. Hammond's daughters also found an orderly to remove Hammond's dentures so she wouldn't choke. They had to go to other rooms to get more materials so that they could clean up Hammond's continued bleeding, and they even had to find a bedpan for Hammond's use. Approximately twenty minutes later, the

15

defendant doctor came into the room with the results of Hammond's x-rays revealing that she had suffered a skull fracture and would require the services of a neurosurgeon. The doctor left, and Hammond remained in the treating room until about 4:10 p.m., when two nurses began an intravenous drip and then left. At 4:30 p.m., two candy stripers took Hammond to the intensive care unit, where they arrived at 4:45 p.m. The IV drip was the only medical care administered to Hammond by hospital personnel in the period between being taken to the treating room at 2:25 p.m. and being put in the ICU at 4:45 p.m. Upon examination in the ICU, Hammond was found to be in an irreversible state neurologically, and she died that night. *Id.*

¶32. The absence of Dr. Wansley from the hospital until 2:00 p.m. on May 12, 1997, is not even remotely comparable to the level of neglect that this Court saw in *Hammond*. Hubbard does not claim, nor can she, that she was left without medical care. Further, Hubbard's claim that Dr. Wansley's failure to consult Dr. Gorman brings this case within the layman's exception is also without merit. Dr. Wansley, while not present, did give orders over the phone to the emergency room doctors and nurses who were caring for Hubbard, and those orders included the consultation of the neurologist, Dr. Gorman. The alleged negligence in this case does not fall under the layman's exception.

### IV. DID THE TRIAL COURT ERR BY ENTERING A FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE AFTER HUBBARD HAD DESIGNATED ANOTHER EXPERT TO TESTIFY?

¶33. An admitted mistake made by the trial court led to the following unusual chain of events. On July 20, 2004, the trial court orally granted Dr. Wansley's motion for summary

16

judgment in part on the grounds that Dr. Stringer was not qualified to testify as an expert.[14] On August 4, 2004, before a written order was entered on the grant of summary judgment, Hubbard filed a motion for extra time in which to designate an expert. Although this motion was opposed by Dr. Wansley, partly on the basis that summary judgment had already been granted, the trial judge signed an order on August 6, 2004, granting Hubbard's motion for time extension. Then on September 3, 2004, Hubbard filed a designation of Dr. Levinstone as her new expert witness.

¶34. The written memorandum and order of the trial court granting Dr. Wansley's motion for summary judgment was entered on December 23, 2004. On January 27, 2005, a final judgment was entered dismissing with prejudice Hubbard's claims against Dr. Wansley. Hubbard filed a motion for reconsideration on February 3, 2005. On February 14, 2005, Dr. Wansley filed a motion to reconsider in response to the trial court's order granting Hubbard's August 2004 motion for more time to designate an expert.[15]

¶35. At a very candid hearing on Hubbard's motion to reconsider on April 4, 2005, the trial judge revealed that he had granted Hubbard's motion for extra time to designate an expert

---

[14] It is unclear whether this was a telephonic or in-person hearing with the trial judge. No record was made of the hearing, but the trial court and the attorneys for both parties admitted on the record that the oral grant of summary judgment took place.

[15] Dr. Wansley's motion is dated February 11, 2004. However, this is obviously a typo and should read 2005. Though the motion does not specify, the only ground for this motion would be under Miss. R Civ. P. 60(b)(2). This would be a proper motion and could have been granted by the trial court. However, as Hubbard correctly points out, this motion was not made within the six months required by Rule 60(b). The motion for more time was granted on August 6, 2004, making Dr. Wansley's motion to reconsider five days late.

inadvertently. The judge actually apologized for his mistake and said that he would let the case "go on up to the Supreme Court." On April 14, 2005, a judgment of dismissal with prejudice denying Hubbard's motion to reconsider was entered.

¶36. Arguing that she justifiably relied on the trial court's grant of thirty extra days to designate an expert, Hubbard cites *Franklin v. Franklin*, 858 So. 2d 110 (Miss. 2003). In *Franklin*, this Court dealt with distribution of attorney's fees in a wrongful death suit. *Franklin*, 858 So. 2d at 112. The original trial judge in *Franklin* consolidated two separate wrongful death cases arising from the same events, and issued an order stating that, in the event of recovery by the two plaintiffs, the money would be divided evenly between them. Since each of the plaintiffs had independent representation, the order also stated that each of the plaintiffs' respective lawyers would be compensated according to their contracts as they existed at the time of consolidation.

¶37. On the day before trial in *Franklin*, the case was settled. The attorney for one of the plaintiffs claimed all of the attorney fees by entitlement because his wrongful death suit had been filed first. The original trial judge recused himself, and the newly appointed judge vacated the order dividing the attorney fees and awarded all to the initial claimant. The attorneys for the other plaintiff appealed.

¶38. This Court took a number of factors into consideration in deciding to overturn the new judge's decision and to reinstate the original order. The Court did find, as Hubbard argues in this case, justifiable reliance on the original order. *Id.* at 122. However, there are major differences between the situation in *Franklin* and the situation in the present case. In

18

*Franklin*, the attorney's who relied on the original order, had worked on their case for more than a year and a half. *Id.* at 112. Also, the Court agreed that the original order: (1) protected the clients by letting them choose their attorneys, (2) was fair to both sides, (3) was reasonable, (4) followed the wrongful death statute, and (5) contemplated that all attorneys would work together for the benefit of the plaintiffs. *Id.* Much more was at play in *Franklin* than mere justifiable reliance by the attorneys. The second order not only reaches an inequitable result; it penalizes heirs who want their own lawyer to represent them and are willing to pay them from their own recovery." *Id.* at 123.

¶39. Hubbard also cites *Thompson v. Patino*, 784 So. 2d 220 (Miss. 2001), in support of her contention that the order granting thirty extra days to designate an expert should stand.[16] In *Thompson*, this Court reversed a trial court's exclusion of an expert affidavit which resulted in the dismissal of the plaintiff's case. However, the facts in *Thompson* are easily distinguishable from the facts in this case. In *Thompson*, the exclusion of the expert testimony was a sanction in response to a discovery violation. *Thompson*, 784 So. 2d at 221. Here, Dr. Stringer was found to be unqualified to testify as to the standard of care. The disqualification of Dr. Stringer was not a "punishment" for any violation on Hubbard's part. The trial judge merely looked at the facts presented to him and ruled that Dr. Stringer was not qualified under the law to testify in this case.

---

[16] This case was also cited in Hubbard's motion for extra time.

¶40. "Any order signed during the course of the proceeding is not final and can be changed during the course of the action and prior to a final judgment." *Franklin*, 858 So. 2d at 121. In the present case, final judgment had not been entered when the trial court mistakenly granted Hubbard's thirty-day motion, nor had it been granted when the trial court entered the written Memorandum Opinion and Order granting summary judgment in favor of Dr. Wansley. In effect, the trial court revoked its order granting Hubbard thirty extra days to designate an expert when it entered the written Memorandum Opinion and Order granting summary judgment.

¶41. Whether it was "justifiable" for Hubbard to rely on the trial court's order granting the extra time to designate an expert is the crucial question. Admittedly, Hubbard knew that summary judgment had already been granted. It would be reasonable to conclude that the trial court's granting of the motion for extra time was, at best, questionable. However, even if Hubbard did honestly believe that the trial court had decided to reverse its grant of summary judgment to Dr. Wansley, the justifiable reliance, and certainly the prejudice, does not rise to the level that was seen in *Franklin*. All Hubbard stood to lose by relying on the trial court's order was the expenses of obtaining a new expert, and that does not justify depriving Dr. Wansley of the summary judgment granted him simply because of an obvious and admitted mistake of the trial court. This issue has no merit.

**V.    DID THE TRIAL COURT ERR IN FINDING THAT HUBBARD FAILED TO ESTABLISH CAUSATION?**

20

¶42.    The trial court's second ground for granting Dr. Wansley's motion for summary judgment was that Hubbard had failed to establish a causal link between her injuries and Dr. Wansley's alleged negligence.  In a medical malpractice case, as in all claims for negligence, causation must be proven in order to establish a prima facie case.  *Drummond*, 627 So. 2d at 268.  Finding that Hubbard had failed to establish a prima facie case, the trial court granted Dr. Wansley's motion for summary judgment.  The trial court found, that Hubbard's proposed causal link between Dr. Wansley's actions and Hubbard's injuries amounted to nothing more than a claim for diminishment of a chance of recovery.  This Court has concluded "that Mississippi law does not permit recovery of damages because of mere diminishment of the 'chance of recovery.'  Recovery is allowed only when the failure of the physician to render the required level of care results in the loss of a reasonable probability of substantial improvement of the plaintiff's condition." *Ladner v. Campbell*, 515 So. 2d 882, 888-89 (Miss. 1987) (citing *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985)).  The *Ladner* Court went on to say that *Clayton* put Mississippi in line with those jurisdictions which require that a plaintiff show that "proper treatment would have provided the patient 'with a greater than fifty (50) percent chance of a better result than was in fact obtained.'" *Ladner*, 515 So. 2d at 889 (citing 54 A.L.R.4th 10 § 2[a]).  *Clayton* "rejected the notion that a mere 'better result absent malpractice' would meet the requirements of causal connection." *Id.*

¶43.    In some cases, the causal link between the plaintiff's injuries, or deteriorated state, and the defendant doctor's alleged negligence is easily proven.  One such case is *Hammond v. Grissom*, 470 So. 2d 1049, where Hammond, after suffering severe injuries, was left without

21

any treatment at all until she had deteriorated to the point where recovery was hopeless. Expert testimony helped to show that the inaction of the medical personnel contributed substantially to Hammond's deterioration and eventual death. "The testimony of the pathologist suggests that the continuous intracranial bleeding unchecked for a number of hours was a major factor causing death." **Hammond**, 470 So. 2d at 1054.

¶44. The case of **Hardy v. Brantley**, 471 So. 2d 358 (Miss. 1985), is another example of an expert testifying as to the actions of a doctor resulting in the deterioration of a patient's condition. There, the defendant doctor failed to diagnose a perforated duodenal ulcer. **Id.** at 360-61. Expert testimony revealed that a perforated duodenal ulcer is very rarely a fatal condition and that it is actually easily diagnosed and treated. **Id.** at 361. If it had not been for the misdiagnosis by the defendant doctor, the patient would have most likely survived.

¶45. In the present case, Dr. Stringer spoke to the issue of causation in two separate affidavits, concluding that the failure to properly test, examine, treat, or seek proper treatment by the attending physicians, nurses, and hospital personnel at Biloxi Regional Medical Center that were involved in the care of Ms. Hubbard from 5/11/97 to 5/13/97 caused, contributed to cause, or was a substantial factor in causing Ms. Hubbard to have medical complications. He specifically stated, "[I]n my opinion, Ms. Hubbard was deprived the *opportunity of full recovery* after her fall because of lack of treatment." (Emphasis added).

¶46. In a deposition given on April 14, 2003, Dr. Stringer answered several questions regarding whether Dr. Wansley's actions caused Hubbard's condition to deteriorate:

22

Q. Now, we're probably going to have a lot more questions on this, but I'm trying to get these things out because Mr. Bloss has a number of questions to ask as well. But when you went through your categories of things that should have been done in the emergency room because of this emergent subarachnoid hemorrhage that you alleged was not appropriately treated, what do you claim was the consequence of that, that even if it had occurred, her outcome would be different?

A. That's a great question. She was not given–the patient was not given the optimum medical care for the treatment of subarachnoid hemorrhage and did suffer delayed consequences of that. Patients–I mean, she could have had all of this occur–she could have had all of this occur had all of this been done, but we do know from the literature and from experience that you can reduce the risk of significant morbidity and mortality[17] with aggressive emergency care of a subarachnoid hemorrhage, that is, medical care.

Q. So, in essence, what you're saying is she was denied a chance at recovery, a chance–

A. A chance to it.

Q. –a chance of a better recovery.

A. Yes.

Q. Are you able to tell us or at the trial of this case tell a jury what would be the difference in her today had she received what you felt she should have received in the emergency room versus how she is now?

A. No.

Q. Why not?

A. **Because, as I just testified, this could have happened with optimum medical care. I'm saying "this" being her current neurological picture.**

---

[17] Ruby Angela Hubbard was still alive at the time of this deposition.

(Emphasis added). Later in the deposition, Dr. Stringer cast further doubt on the issue of causation in this case:

> Q. In terms of a reasonable medical probability can you in good faith say that there would have been a substantial improvement in her condition?
>
> A. I think that would be extremely difficult to answer. I mean, I've already testified to the fact that it would–that she was not given that opportunity. **And so by not being given an opportunity, I guess we'll never know.**

(Emphasis added). Dr. Stringer's deposition leaves in doubt whether Hubbard would have been any better off if she had received the "optimal" medical care which Dr. Stringer claims was not provided.

¶47. After this deposition, Dr. Stringer gave one more affidavit on August 18, 2003. The major difference in this affidavit and Dr. Stringer's previous affidavits is that this affidavit contained the "magical" language: "[I]t is my opinion that had Ruby Hubbard been treated properly by Dr. Wansley, or if Dr. Wansley had notified appropriate personnel, it is my opinion that Ruby Hubbard would have had a greater than fifty percent chance of reduced neurological injury."

¶48. However, Dr. Stringer's assertion that Hubbard would have had a fifty percent greater chance of recovery is given with no real facts to back it up. "The 'party opposing the motion [for summary judgment] must by affidavit or otherwise set forth *specific facts* showing that there are indeed issues for trial.'" ***Drummond***, 627 So. 2d at 267 (quoting ***Palmer***, 564 So. 2d at 1356) (Emphasis added). The language of Dr. Stringer's affidavit is almost wholly conclusory on the issue of causation and gives very little in the way of specific facts and

medical analysis to substantiate the claim that Hubbard had a greater than fifty percent chance of substantial recovery if she had received the "optimal care" of which Dr. Stringer spoke. This Court has shown its disapproval of such affidavits in the past. *Walker*, 529 So. 2d at 187 n.2 (stating that affidavits which are "almost wholly conclusory" are "less than satisfactory"). In addition to the language of the affidavit being conclusory, it also seems to be an attempt to cure Dr. Stringer's contradictory deposition testimony.

¶49. Hubbard also claims that Dr. Alan Levinstone, Hubbard's expert who was designated in accordance with the grant of thirty extra days to designate an expert, has created a genuine issue of material fact in this case. However, Hubbard has provided no sworn testimony from Dr. Levinstone. In order to create an genuine issue of material fact, there must be presented, by affidavit or otherwise, a sworn statement made upon personal knowledge that shows that the party providing the evidence is competent to testify. *Drummond*, 627 So. 2d at 267-68.

¶50. Taking into consideration all of the evidence that was before the trial court in this case, Hubbard did not present evidence sufficient to create a genuine issue of material fact as to causation. Therefore, summary judgment was proper on the issue of causation, as Hubbard had not established a prima facie case.

## CONCLUSION

¶51. We affirm the trial court's grant of summary judgment in favor of Dr. Wansley. The trial court properly found that: Dr. Stringer was not qualified to testify as to the standard of care of an internist; the alleged negligence of Dr. Wansley did not fall under the layman's exception; the grant of thirty extra days in which Hubbard could designate an expert was an

25

inadvertent mistake on the part of the trial court and did not result in reliance sufficient to deny Dr. Wansley the summary judgment which he had already been granted; and Hubbard did not present evidence sufficient to create a genuine issue of material fact as to causation in this case.

¶52.    **AFFIRMED.**

    **SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR.  DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY AND GRAVES, JJ.**

    **DIAZ, JUSTICE, DISSENTING:**

¶53.    Because the majority fails to apply our medical malpractice cases regarding the standard of care, and effectively overrules our prior case law without reasoning or citation, I must respectfully dissent.

¶54.    The majority states, without the benefit of citation, that "[w]hile it is obvious that Dr. Stringer [the expert for the plaintiffs] is a very experienced and knowledgeable neurosurgeon and that he has experience in treating subarachnoid hemorrhages as a neurosurgeon, Hubbard has offered no evidence that Dr. Stringer has any familiarity with the standard of care that would be required of an internal medicine specialist in treating a subarachnoid hemorrhage." Maj. Op. at ¶ 19.  Thus, in one sentence, the majority somehow concludes that Dr. Stringer is a well-qualified neurosurgeon with a particular specialty, yet somehow cannot speak to the standard of care for that very same area in which he is expert.

26

¶55.     This strains common sense; for is it not perfectly logical that a person who is an expert in a subject can also testify to the relatively mundane features of that same specialty, such as the standard of care?  It also departs dramatically from our prior case law.  In three prior cases we have addressed this exact same scenario and rejected the majority's reasoning.  The majority states that "it cannot be said that the trial court abused its discretion in holding that Dr. Stringer was not qualified to testify as to the standard of an internal medicine practitioner," and offers that "our precedent requires familiarity not with a particular 'subject,' but with a specialty."  Again, no citation is offered; indeed, our precedent states the exact opposite, as "[t]he general rule as to expert testimony in medical malpractice actions is that 'a specialist in a particular branch within a profession *will not be required*.'" ***Brown v. Mladineo***, 504 So. 2d 1201, 1202 (Miss. 1987) (*quoting* C. McCormick, Evidence, § 13 (3d ed. 1984) (emphasis added)); *see also* ***West v. Sanders Clinic for Women, P.A.***, 661 So. 2d 714, 718 (Miss. 1995); ***Sheffield v. Goodwin***, 740 So. 2d 854, 857 (Miss. 1999) ("We have often reiterated the general rule that 'a specialist in a particular branch within a profession will not be required.'") (*citing* ***Brown*** and ***West***).

¶56.     Rather, "[m]ost courts," including our own, "allow a doctor to testify if they are satisfied of his familiarity with the standards of a specialty, though he may not practice the specialty himself." ***Id.***; ***West***, 661 So. 2d at 718-19.  In ***Brown***, we adopted the reasoning that "it is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." ***Id.*** (internal quotations and citation omitted); ***West***, 661 So. 2d at 719; *see also* ***Sheffield v. Goodwin***, 740 So. 2d 854, 857 (Miss.

27

1999); Robert A. Weems & Robert M. Weems, *Mississippi Law of Torts* § 4:1, at 48 (2002) ("a physician in one specialty can testify as to the standard of care in another specialty, provided he is familiar with the standards of that other specialty") (footnote omitted). As one commentator has stated regarding *Brown*, "it was not the expert's *title* but his *knowledge* which qualified him to testify." David L. Merideth, *The Medical Expert Witness in Mississippi: Outgunning the Opposition*, 64 Miss. L.J. 85, 115 (1994) (emphasis added).

¶57. In distinguishing prior case law, we went on to note that "[i]t was not our intent to adopt a uniquely restrictive standard by holding that *only* a specialist can testify about the standards of his own specialty." *Brown*, 504 So. 2d at 1203 (emphasis in original); *West*, 661 So. 2d at 719. Yet even by that harsh standard, which is not our rule and which we have explicitly rejected on two occasions, Dr. Stringer would have survived qualification, as he is a specialist in that branch of neurosurgery that treats subarachnoid hemorrhages.

¶58. As our Court of Appeals aptly stated, "[w]hether any doctor may testify to a particular matter depends upon his knowledge, training, experience, and the like, and, while an expert's testimony will be limited to his or her demonstrated area of expertise, there is nothing in our law that prevents [a] specialist . . . from having expertise in general hospital procedures as well as another speciality or area." *Partin v. North Miss. Med. Ctr., Inc.*, 929 So. 2d 924, 930 (Miss. Ct. App. 2005).

¶59. According to both our well-settled precedent and common sense, Dr. Stringer is qualified to testify to the standard of care in this case. Accordingly, I would reverse the order of the trial court granting summary judgment and allow him to testify.

**EASLEY AND GRAVES, JJ., JOIN THIS OPINION.**